Docusign Envelope ID: FE6C4EC4-41A3-41AD-9942-180E5B49C879

## INSERTION ORDER - Health Choice Now, LLC

| Company: Health Choice Now, LLC | | Advertiser: Alvarado Marketing Group | |
|---|---|---|---|
| Primary Contact | Billing Contact | Primary Contact | Billing Contact |
| Name: Eric Feinman | Name: Tonya Farmer | Name: Jess Jordan | Name: jESS jORDAN |
| Email: eric@healthchoicenow.com | Email: finance@healthchoicenow.com | Email: JJordan@alvaradomedia.tech | Email: jJORDAN@ALVARADOMEDIA.TE |
| Phone: | Phone: | Phone: | Phone: |
| Address: 250 W Lake Mary Blvd. Unit #6008, Sanford, FL 32773 | Address: 250 W Lake Mary Blvd. Unit #6008, Sanford, FL 32773 | Address: 5100 Matlock rd. Mansfield Texas 76063 suite 500 | Address: |

| Campaign Details | |
|---|---|
| Campaign Name: | ACA / Medicare Advantage |
| Campaign Type: | Warm Transfers |
| Deliverable: | ☐ Clicks    ☐ Leads    ☒ Calls    ☐ Other: |
| Time Period: | |
| Total Cap: | none |
| Rate Model: | Duration |
| Rate (USD$): | $25 ACA | $35 Medicare |
| Max Scrub Rate: | N/A |
| Total Budget: | N/A |
| Conversion Point: | ACA: 60 SEC Medicare: 120 SEC |
| Required Fields: | N/A |
| Campaign Geo: | Provided by client |

| Insertion Order Special Terms |
|---|
| A.    This Insertion Order ("IO") shall be governed by and incorporated into the Health Choice Now, LLC Terms and Conditions for Sales entered into by the parties on or about [11.13.24] (the "Terms"). Capitalized terms not defined in this IO shall have the same meaning, if any, assigned to them in the Terms. If there is conflict between the Terms and this IO, this IO shall govern to the extent necessary to resolve such conflict.<br>B.    Campaign Details (except for Deliverable) may be amended by confirmed emails or change order(s) exchanged by authorized representatives of each party.<br>C.    Deliverables not contested within ten (10) days shall be indisputable.<br>D.    For the avoidance of doubt, these terms shall supersede any click-wrap, click-through, or other online agreement that either party may present or navigate through in conjunction herewith. |

**IN WITNESS WHEREOF,** the parties have caused this IO to be duly executed as of the last date below.

| Company: Health Choice Now, LLC | | Advertiser: Alvarado Marketing Group | |
|---|---|---|---|
| Signature: | *Eric Feinman* (CD6A39C9CE03413...) | Signature: | *Jess Jordan* (F7307984945400...) |
| Name: | Eric Feinman | Name: | Jess Jordan |
| Title: | President | Title: | dIIRECTOR OF oPERATIONS |
| Date: | 11/14/2024 | Date: | 11/13/2024 |

**Exhibit 1**

HIK 000013

Docusign Envelope ID: FE6C4EC4-41A3-41AD-9942-180E5B49C879

# HEALTH CHOICE NOW, LLC
## TERMS AND CONDITIONS FOR SALES

These Terms and Conditions For Sales ("Terms") are entered into by and between Health Choice Now, LLC, a New Jersey limited liability company, or its affiliated entity as specified on an applicable insertion order ("IO"), with an address of 250 W Lake Mary Blvd. Unit #6008, Sanford, FL 32773, ("Company") and [Alvarado Marketing Group], a [Texas] [LLC] with its principal place of business at [5100 Matlock rd. Mansfield Texas 76063 suite 500] ("Advertiser"). These Terms shall govern any IO to which they are attached or that incorporate by reference these Terms. If there is conflict between these Terms and an IO, the IO shall govern to the extent necessary to resolve such conflict. These Terms are effective as of the date that they are signed by all parties (the "Effective Date").

1. **General.**

Company shall generate and deliver to Advertiser impressions, clicks, leads, call transfers, or other actions (collectively, "Actions"), and/or distribute banners, buttons, text-links, clicks, co-registrations, pop-ups, e-mails, texts, graphic files and other media (collectively, "Creatives") (Actions and Creatives may be referred to collectively as "Deliverables"), as specified in one or more IO(s) (the "Services"). Neither Company nor Advertiser shall have any minimum obligation hereunder, unless specifically set forth in an IO.

2. **Tracking/Payment.**

   A. **Fees and Payment.** Advertiser shall pay Company fees for Services as specified in the IO ("Fees"). Unless otherwise specified in an IO, Advertiser shall be responsible for tracking of all Services, which tracking may be made available to Company through online access to a real-time tracking platform. In the event of a malfunction of Advertiser's tracking methods, the parties shall use good-faith efforts to establish the appropriate Fees. Unless otherwise specified in an IO: (i) If tracking and reporting is not provided in real-time, tracking and reporting will be due monthly within three (3) business days of the end of such month; (ii) Company shall provide Advertiser with a monthly invoice for Fees based on Advertiser's tracking and reporting; (iii) Advertiser has ten (10) calendar days from the end of the prior month's reporting period to provide written notice of any good-faith dispute of any Fees, after which all undisputed Fees shall be indisputable; and (iv) Advertiser shall pay all undisputed Fees to Company no later than twenty (20) calendar days from the date of the invoice.

   B. **Credit Card Authorization.** Except with respect to prepaid Services, Company may require Advertiser to provide a credit card and associated billing information to Company to maintain on file in the event of non-payment of undisputed Fees. In the event that Advertiser fails to timely pay an invoice, Advertiser authorizes Company to charge such credit card for any amount up to the total amount of all unpaid and undisputed Fees associated with such invoice. Any such credit card payments will be assessed a three and a half percent (3.5%) processing fee, charged at the time of processing.

   C. **Taxes.** Advertiser will be responsible for, and will promptly pay or reimburse Company for, the payment of any sales, use, excise, value-added, or similar taxes, assessments, or duties (or other similar charges) imposed by any governmental agency that are based on or with respect to any Services or goods provided by Company to Advertiser, or the amounts payable to Company therefore.

   D. **Unpaid Fees.** Undisputed Fees not paid on or prior to their applicable due date, will bear interest at a rate of one and a half percent (1.5%) per month (or the highest lawful rate, if less). Advertiser shall be responsible for all reasonable expenses (including attorneys' fees and collection costs) related to collecting undisputed Fees owed. Company may offset any fees it or any of its affiliated entities owe to Advertiser or any of its affiliated entities by any undisputed Fees that are owed.

   E. **Audit.** The party responsible for tracking and billing (the "responsible party") shall maintain accurate books and records regarding the determination of revenue and Fees due hereunder. The other party shall have the right to audit such books and records at its own expense upon reasonable prior notice no more than once every six (6) months. If an audit reveals an underpayment owed to Company, Advertiser shall pay such amount within fifteen

Docusign Envelope ID: FE6C4EC4-41A3-41AD-9942-180E5B49C879

(15) days. If Advertiser is the tracking party and the underreporting exceeds 10% of the correct amount, Advertiser shall pay Company's reasonable out-of-pocket audit costs.

**3. Data Privacy.**

    **A. Ownership.** Deliverables may include information that relates to an identifiable person or device such as IP address, device ID, telephone number, name, etc. (collectively, "User Data"). Advertiser has no ownership interest in, and is prohibited from using, transferring, or storing any User Data from rejected or returned Deliverables, or any other Deliverables that are not accepted and paid for by Advertiser (collectively, "Unaccepted Deliverables"). Unless otherwise specified in an IO, Company and Advertiser shall have joint ownership of User Data from Deliverables that are not Unaccepted Deliverables.

    **B. Privacy Obligations.** Each party shall: (i) Maintain reasonable security measures, procedures, and practices appropriate to the nature of the information collected, used, or sold under the Agreement and to protect such information from unauthorized access, destruction, use, modification, or disclosure. Such security measures shall meet or exceed industry standards; (ii) Provide prompt written notice of any unauthorized disclosure, or likely unauthorized disclosure, of User Data, to the extent necessary for compliance by each party under applicable laws; and (iii) Promptly provide all assistance as is reasonably requested by the other party to meets its obligations under applicable privacy laws — including, but not limited to, the California Consumer Privacy Act, Cal. Civ. Code § § 1798.100 et seq. ("CCPA"), the California Privacy Rights Act ("CPRA"), the Colorado Privacy Act ("CPA"), the Connecticut Data Privacy Act ("CDPA"), the Virginia Consumer Data Protection Act ("VCDPA") and the Utah Consumer Privacy Act ("UCPA") — with respect to responding to valid access, deletion, correction, opt-out preference, and similar requests; and (iv) with respect to websites that collect User Data or other personal information that may be exchanged hereunder, contain a link to the party's privacy policy, which shall comply with all applicable laws and permit the exchange of such information.

**4. Terms for Specific Deliverables.**

The terms in the Section (Terms for Specific Deliverables) shall only apply to the extent that a corresponding Deliverable is specified in an IO.

    **A. Clicks.** Company shall generate engagement by individuals with URLs or tracking devices as specified in an IO ("Clicks"). Clicks may only be generated through intended action by genuine consumers, and the use of fake redirects, automated software, or other fraudulent mechanisms is prohibited. Advertiser is responsible for providing prior written notice to Company of the URLs or other specifications as to where clicks are to be directed ("Landers"). Advertiser is responsible for maintaining such Landers and shall provide written notice to Company at least three (3) business day prior to changing any Landers. Absent such notice, Advertiser shall be responsible for any Fees for Clicks to such Landers provided that such Clicks otherwise comply with this Agreement.

    **B. Leads and/or Call Transfers.** Company shall provide (i) User Data, as specified in an IO, to permit Advertiser to contact the individuals associated with such User Data ("Leads"), and/or (ii) transfers of telephone calls with individuals meeting the criteria as set forth in an applicable IO ("Call Transfers"). Company shall only provide Leads and Call Transfers for individuals who have consented to receive such contact. Advertiser is responsible for providing prior written notice to Company of the names of any clients, designees, or other third parties that may call any Lead or receive any Call Transfer generated hereunder ("Advertiser Designees"). Advertiser may only transfer or provide Leads or Call Transfers to Advertiser Designees in compliance with applicable laws and within the scope of consent of the individuals associated with such Leads or Call Transfers, and Advertiser must restrict further transfer by Advertiser Designees of User Data associated with such Leads or Call Transfers. Company may record any calls with Advertiser or Advertiser Designees, or transfers of such calls, including, without limitation, Call Transfers. Company shall be responsible for obtaining consent of consumers to record its calls with such consumers and Advertiser shall be responsible for obtaining consent of its agents or other transferees of such calls to record such calls. With respect to (i) any Leads that include permission to call and (ii) any Call Transfer that originates from an outbound call, Company agrees to provide to Advertiser, upon request from Advertiser, evidence of prior express written consent to call such consumer as required under applicable laws (including, without limitation, the Telephone Consumer Protection Act ("TCPA")), which evidence will include, at a minimum: screenshots of the notification and consent language appearing on sources from which the applicable

Docusign Envelope ID: FE6C4EC4-41A3-41AD-9942-180E5B49C879

User Data was collected; the IP address of the source of the applicable User Data; and the date and time stamp indicating the time the applicable User Data was collected. Evidence of prior express written consent will include an agreement, in writing, bearing the signature of the consumer in writing (which may be electronic as permitted by applicable law) that authorizes a list of partners, expressly including Advertiser, to deliver or cause to be delivered to the individual advertisements or telemarketing messages using an automatic telephone dialing syste and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered.

**5.   Intellectual Property.**

Each party hereby acknowledges that, as between the parties, the other party and its licensors own all rights, title and interest in and to their respective websites, advertising creatives, and other Intellectual Property Rights (defined below) used in their respective businesses, including, without limitation, any data resulting from their interactions with customers, with the exception of jointly owned User Data. Each party's name(s) and logo(s) are trademarks of such party, and no right or license is granted to the other party to use such trademarks, except as expressly set forth herein. "Intellectual Property Rights", as used herein, includes all intellectual property rights worldwide, including (i) trade names, registered and unregistered trademarks, service marks, logos and any applications therefor; (ii) all patents, patent applications and invention disclosures, including the inventions and improvements described and claimed therein; (iii) all registered and unregistered copyrights in both published works and unpublished works; (iv) all rights in mask works; (v) all rights in such party's know-how, trade secrets, ideas, confidential or proprietary information, software, both object and source code, technical information, data, process technology, plans, drawings, inventions and discoveries, whether or not patentable, and (vi) all rights in internet web sites, internet domain names, keywords, keyword values and attributes, key word clusters and clustering techniques, advertisement creative and account organization on search engines.

**6.   Confidentiality.**

The terms of this Agreement and any non-public, proprietary, or sensitive information (written, verbal or otherwise) provided by the parties hereunder shall be deemed to be "Confidential Information." Without limiting the generality of the foregoing, Confidential Information shall include: any business, technical or financial information, software, trade secrets, methodologies, techniques, affiliate contact lists, vendor contact lists, pricing, sales information, forecasts, and any proprietary or confidential information of any third party. For the avoidance of doubt, any and all Unaccepted Deliverables, and associated User Data, shall be deemed Confidential Information of Company. Neither party shall at any time disclose any terms of this Agreement, nor any Confidential Information shared pursuant hereto, to any third party except to the professional advisors of either party or as may be required by applicable law, in which case advance written notice is to be given to the other party to afford it an opportunity to intervene and seek an order or other appropriate relief for the protection of its Confidential Information. The foregoing confidentiality provisions shall not apply where the receiving party can demonstrate that the information: (i) was previously known to the receiving party at the time of disclosure, free of any obligation to keep it confidential; (ii) became publicly known through no wrongful act of the receiving party; (iii) was rightfully received from a third party lawfully in possession of such information and who was not bound under any confidentiality provisions; or (iv) is independently developed without reliance upon or reference to the other receiving party's Confidential Information. Notwithstanding the foregoing, the parties acknowledge and agree that Company may list Advertiser's name and identify Advertiser as a client on Company's website, in other marketing material and verbally in connection with discussions between Company and prospective clients. The parties agree that monetary damages for breach of this Confidentiality Section may not be adequate and that the non-breaching party shall be further entitled to injunctive relief without the requirement to post a bond.

**7.   Representations and Warranties.**

   **A.   General.**   Each party represents and warrants to the other party that: (i) it has the full power and authority to enter into this Agreement, to grant the licenses granted hereunder and to perform the acts required of it hereunder; (ii) this Agreement constitutes the legal, valid and binding obligation of such party, enforceable against it in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and except as may be limited by federal principles of equity; and (iii) it shall comply with these Terms and all applicable laws including, but not limited to, the Federal Trade Commission Act, Fair Credit Reporting Act, TCPA, Do Not Call

Docusign Envelope ID: FE6C4EC4-41A3-41AD-9942-180E5B49C879

Implementation Act, Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003 ("CAN-SPAM"), Amended Telemarketing Sales Rule ("TSR"), California Business & Professions Code § 17529.5, Restore Online Shoppers Confidence Act, California Business & Professions Code § 17600-06, and state unfair, deceptive, or abusive acts or practices ("UDAAP") laws.

    **B. Creatives.** To the extent that Advertiser provides or approves Creatives for use hereunder, or Company uses unapproved Creatives, such party represents and warrants that such Creatives shall: (i) only be intended for and, to the extent possible, disseminated to adults, (ii) not infringe upon any third-party rights, including Intellectual Property Rights (as defined below), and (iii) be truthful, non-deceptive, and comply with all applicable laws.

    **C. Actions.** Company further represents and warrants that (i) Actions shall not be generated using any illegal or fraudulent means, and (ii) receipt of, or eligibility for, any incentive or compensation shall not be conditioned on completion of any Action.

    **D. Usage.** Advertiser further represents and warrants that (i) neither Advertiser nor Advertiser Designees shall engage in any harassing, abusive, or illegal usage of Deliverables or User Data; (ii) Advertiser and Advertiser Designees may only use Deliverables and User Data for offering or marketing the relevant products or services as specified in an IO, and (iii) Advertiser and Advertiser Designees hold all applicable licenses necessary for offering or marketing the relevant products or services as specified in an IO.

**8. Indemnification.**

    **A. Obligations.** Each party (the "indemnifying party") hereby agrees to defend, indemnify and hold harmless the other party, and its respective officers, directors, shareholders, affiliates, and employees (each, an "indemnified party") from and against any losses, damages, liabilities, costs and expenses (including, without limitation, reasonable attorneys' fees, court costs and expert witness fees, if applicable) (collectively, "Losses") arising directly out of a claim or action brought against an indemnified party by a third party (collectively, the "claims") resulting from a breach of these Terms by the indemnifying party, including, without limitation, the breach of any applicable law by the indemnifying party. Notwithstanding the foregoing, if there is a claim that a Lead or outbound Call Transfer sold by Company for a telemarketing campaign to Advertiser did not have TCPA Consent, if Company can prove with competent evidence that it obtained TCPA Consent for the Lead or outbound Call Transfer that gave rise to the claim, then Company will support Advertiser in defending the claim, and will provide it with documentary proof of valid TCPA Consent, but will not defend, indemnify or hold Advertiser harmless unless there is a final determination by a court of competent jurisdiction (or in the context of settlement negotiations, an admission by Company) that Company did not obtain valid TCPA Consent. In that event, Company shall fully indemnify, defend and hold Advertiser from all Losses associated with such Lead or outbound Call Transfer. Notwithstanding anything to the contrary in this Agreement, Company provides no warranty or representation, and shall have no liability or indemnification obligation, with respect to calls or texts that are made using a prerecorded or artificial voice.

    **B. Notice.** If any claim is or will be brought against the indemnified party in respect to any allegation for which indemnity may be sought from the indemnifying party, the indemnified party will promptly notify the indemnifying party of any such claim of which it becomes aware (and in no case later than fifteen (15) business days upon becoming aware of such claim) and will provide reasonable cooperation to the indemnifying party at the indemnifying party's expense in connection with the defense or settlement of any such claim.

    **C. Procedures.** Promptly upon notice of an indemnification claim (and in no case later than five (5) business days prior to any court-related deadline) the indemnified party shall elect in writing either that:

    (i) The indemnifying party shall have sole and exclusive control over the defense and settlement of any such third party claim; provided, however, the indemnifying party will not agree to any judgment or enter into any settlement that adversely affects the indemnified party's rights or interests without the indemnified party's written consent, which will not be unreasonably withheld or delayed. If the indemnified party elects for the indemnifying party to have sole and exclusive control of the defense pursuant to this subsection, the indemnified party shall be entitled to participate at its own expense in the defense of any such claim; or

HIK 000017

Docusign Envelope ID: FE6C4EC4-41A3-41AD-9942-180E5B49C879

(ii) The indemnified party shall have sole and exclusive control over the defense and settlement of any such third party claim, however, the indemnified party will not agree to any judgment or enter into any settlement that adversely affects the indemnifying party's rights or interests without the indemnifying party's written consent, which will not be unreasonably withheld or delayed. If the indemnified party elects to have sole and exclusive control of the defense pursuant to this subsection, the indemnifying party shall have no obligation to pay any of the indemnified party's attorney's fees for such defense.

**9. No Warranty.**

EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT, NEITHER PARTY MAKES ANY WARRANTY WHATSOEVER, EXPRESS OR IMPLIED, AS TO THE DELIVERABLES, RELATED INFORMATION, PRODUCTS, SERVICES, AND/OR INFORMATION PROVIDED HEREUNDER. ADVERTISER UNDERSTANDS AND AGREES THAT THE DELIVERABLES AND RELATED INFORMATION IS PROVIDED ON AN AS-IS BASIS. COMPANY MAKES NO WARRANTY AS TO WHETHER ADVERTISER WILL REALIZE ANY PROFIT OR RECEIVE ANY PAYMENT FROM THE DELIVERABLES PROVIDED. UNLESS SET FORTH OTHERWISE HEREIN, BOTH PARTIES DISCLAIM ANY WARRANTIES THAT COULD BE IMPLIED IN CONTRACT, IN LAW, OR IN EQUITY, INCLUDING WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, QUALITY, ACCURACY, COMPLETENESS, RELIABILITY, OR PERFORMANCE, OR ARISING FROM USAGE OF TRADE, COURSE OF DEALING, OR COURSE OF PERFORMANCE.

**10. Limitation of Liability.**

WITH THE EXCEPTION OF GROSS NEGLIGENCE AND/OR WILLFUL MISCONDUCT, IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER UNDER THE AGREEMENT FOR ANY CONSEQUENTIAL, SPECIAL, LOST PROFITS, INDIRECT OR OTHER DAMAGES WHETHER BASED IN CONTRACT, TORT OR OTHERWISE, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND NOTWITHSTANDING ANY FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY. EACH PARTY'S AGGREGATE LIABILITY UNDER THE AGREEMENT FOR ANY CLAIM IS LIMITED TO THE GREATER OF: (i) THE LIMITS OF ANY APPLICABLE INSURANCE POLICY, (ii) AN AMOUNT EQUAL TO THE TOTAL AMOUNT PAID BY ADVERTISER TO COMPANY HEREUNDER; OR (iii) ONE MILLION DOLLARS. EACH PARTY ACKNOWLEDGES THAT THE OTHER PARTY HAS ENTERED INTO THE AGREEMENT IN RELIANCE UPON THE LIMITATIONS OF LIABILITY SET FORTH HEREIN AND THAT THE SAME IS AN ESSENTIAL BASIS OF THE BARGAIN BETWEEN THE PARTIES.

**11. Termination.**

The initial term of this Agreement will be one year from the Effective Date ("Initial Term"). Thereafter, this Agreement will renew automatically each year for as long as Company is continuing to provide Services on any campaign(s) governed by the IO(s), notwithstanding any end date that may be specified in the IO(s) ("Term"). Either party may terminate this Agreement and/or pause or terminate a campaign governed by an IO, upon two (2) business days' prior written notice to the other party. The parties understand and agree that if a campaign governed by an IO is paused, the Term will not expire if the subject campaign is reactivated within the ensuing three (3) month period. In the event of a material breach by either party, the non-breaching party may terminate the Agreement immediately upon written notice to the other party (email sufficient). Any termination of the Agreement shall not relieve Advertiser of its payment obligations for undisputed Fees arising from Deliverables generated prior to such termination.

**12. Miscellaneous.**

   **A. Force Majeure.** Other than for payment obligations, neither party will be liable, or be considered to be in breach of this Agreement, on account of such party's delay or failure to perform as required under the terms of this Agreement as a result of any causes or conditions that are beyond such party's reasonable control and that such party is unable to overcome through the exercise of commercially reasonable diligence (a "Force Majeure Event"). If any such

HIK 000018

Docusign Envelope ID: FE6C4EC4-41A3-41AD-9942-180E5B49C879

Force Majeure Event occurs, including, without limitation, acts of God, fires, explosions, telecommunications, Internet or network failure, results of vandalism or computer hacking, storm or other natural occurrences, national emergencies, acts of terrorism, insurrections, riots, wars, strikes or other labor difficulties, or any act or omission of any other person or entity, the affected party will give the other party prompt notice of such Force Majeure Event and any resulting delay or inability to perform, and will use commercially reasonable efforts to minimize the impact of any such event.

    **B.  Relationship of the Parties.**  The relationship of parties established by this Agreement is solely that of independent contractors, and neither party is an employee, agent, partner or joint venturer of the other.  Neither party shall make any representations, warranties or covenants, or assume or create any obligations, on the other party's behalf.  Each party shall be solely responsible for the actions of its respective employees, agents and representatives.

    **C.  Jurisdiction and Venue.**  The Agreement will be interpreted, construed and enforced in all respects in accordance with the laws of the State of Delaware, without giving effect to its conflicts of law principles.  Each party irrevocably consents to the exclusive jurisdiction of the state and federal courts of the defending party in connection with any action arising under or in connection with this Agreement. The parties agree that service pursuant to the notice provisions hereunder constitute valid and effective service of process in any action arising under this Agreement.

    **D.  Notices.**  Unless otherwise expressly provided herein, all notices shall be given in writing and delivered via email or registered mail or overnight express carrier (e.g. FedEx or UPS) to the email address or physical address provided by each party on the applicable IO and, in the case of Company, must also include a cc email sent to compliance@healthchoicenow.com.

    **E.  Remedies; Waiver.**  Except as otherwise specified herein, the rights and remedies granted to a party under this Agreement are cumulative and in addition to, not in lieu of, any other rights and remedies which the party may possess at law or in equity.  Failure of a party to require strict performance by the other party of any provision shall not affect the first party's right to require strict performance thereafter. No delay or failure by either party to exercise any right, power or option under this Agreement, and no partial or single exercise of that right, power or option, shall constitute a waiver of that or any other right, power or option, unless otherwise expressly provided herein.  No waiver by either party of any breach of any provision hereof shall be deemed a waiver of any subsequent or prior breach of the same or any other provision.  No waiver of any right shall be effective against a party unless in writing and executed by the waiving party.  A waiver of default shall not be a waiver of any other or subsequent default.

    **F.  Entire Agreement.**  This Agreement, together with any applicable IOs, contains the entire agreement between the parties with respect to the subject matter hereof and supersedes any and all prior written, electronic or oral agreements and understandings between the Parties. No modification change or amendment of this Agreement or any IO shall be valid, effective or legally enforceable against a party unless in writing and executed by a duly authorized representative of both parties.

    **G.  Severability.**  If any provision contained in the Agreement is determined by a court of competent jurisdiction to be invalid, illegal or unenforceable in any respect under any applicable law, then such provision will be severed and replaced with a new provision that most closely reflects the real original intention of the parties, and the remaining provisions of the Agreement will remain valid, legally binding and in full force and effect. Any prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. For the avoidance of doubt, this Agreement shall supersede any click-wrap, click-through, or other online agreement that either party may present or navigate through in conjunction with the Services.

    **H.  Assignment.**  Neither party shall, without the prior written consent of the other party, assign its rights or delegate its duties under the Agreement, which consent shall not be unreasonably withheld, delayed or conditioned; *provided, however*, that either party may, in the event of a merger, acquisition, joint venture, or sale of substantially all of such party's assets or business (or any substantially similar transaction), assign the Agreement without the consent of the other party.  Subject to the foregoing, the provisions of the Agreement shall be binding upon and inure to the benefit of the parties and their permitted successors, heirs and assigns.

    **I.  Survival.**  All provisions of this Agreement that by their nature and/or content are intended to survive completion, termination or expiration hereof shall so survive.  Without limiting the generality of the foregoing, the terms of the Agreement set forth in Sections 2, 3, 5-10, and 12 shall so survive.

Docusign Envelope ID: FE6C4EC4-41A3-41AD-9942-180E5B49C879

**J. Costs and Expenses.** Except as may be expressly provided herein, each party agrees that it is solely responsible for all costs and expenses incurred by it in connection with the performance of its obligations and the bringing of any claims or disputes hereunder.

**K. No Third Party Rights.** Except as may be expressly provided herein, nothing in this Agreement shall be enforceable by any party other than the parties hereto, and no third party beneficiary rights are conferred on any third party.

**L. Section Headings**. The titles to the paragraphs in this Agreement are solely for the convenience of the parties and shall not be used to explain, modify, simplify, or aid in the interpretation of said covenants or provisions set forth therein.

**M. Counterparts**. This Agreement and any IO(s) may be executed in any number of counterparts, each of which shall be deemed to be an original as against the party(s) whose signature(s) appears thereon, and all of which shall together constitute one and the same instrument. A faxed signature shall have the same legally binding effect as an original signature. An email signature shall not be legally sufficient to bind either party to this Agreement.

**N. No Reliance; Interpretation**. Each party acknowledges and agrees that it (i) has had the opportunity to seek the advice of legal counsel of its choice, (ii) has read and understood all of the terms and conditions of this Agreement, and (iii) acknowledges that the provisions of this Agreement were negotiated to reflect an informed, voluntary allocation between them of all the risks (both known and unknown) associated with the transactions contemplated hereunder. Neither party has relied upon any statement, representation or promise of the other party in executing this Agreement, except as may be expressly stated herein. Each party acknowledges that it participated in the preparation of this Agreement. The parties stipulate, therefore, that the rule of construction that ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement.

**IN WITNESS WHEREOF,** and intending to be legally bound hereby, Advertiser and Company have each caused these Terms to be executed by their duly authorized representatives.

| | |
|---|---|
| **Advertiser:  Alvarado Marketing Group** | **Company: Health Choice Now, LLC** |
| Signature: *Jess Jordan* (Signed by: F7397968B945400…) | Signature: *Eric Feinman* (DocuSigned by: CD6A39C9CE03413…) |
| Name: Jess Jordan | Name: Eric Feinman |
| Title: dIRECTOR OF OPERATIONS | Title: President |
| Date: 11/13/2024 | Date: 11/14/2024 |

HIK 000020