**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION**

| | |
|---|---|
| **MONTWAIN CARTER, individual and on behalf of all other similarly situated**<br><br>**Plaintiff,**<br><br>**v**<br><br>**HEALTH INSURANCE KING AGENCY, LLC, ALVARADO MARKETING GROUP, INC, AND HEALTH CHOICE NOW, LLC**<br><br>**Defendants.** | **NO. 3:25-cv-00005-SHL-WPK** |

**ALVARADO MARKETING GROUP, INC. AND HEALTH
INSURANCE KING, LLC'S MOTION TO DISMISS FOR LACK
OF PERSONAL JURISDICTION**

**TABLE OF CONTENTS**

I. INTRODUCTION .......................................................................... 2

II. FACTUAL BACKGROUND ............................................. 3

III. ARGUMENTS AND AUTHORITIES .............................................. 5

    A. This Court has no general personal jurisdiction over HIK or Alvarado........................................................................... 6

    B. This Court has no specific personal jurisdiction over HIK or Alvarado based on them making any phone calls to Plaintiff............ 7

    C. This Court has no specific personal jurisdiction over HIK or Alvarado based on them being agents for Health Choice Now ........ 10

    D. This Court has no specific personal jurisdiction over HIK or Alvarado based on them ratifying any conduct of Health Choice Now .......................................................................... 14

IV. CONCLUSION AND PRAYER ..................................................... 15

CERTIFICATE OF SERVICE ........................................................... 17

## I.    INTRODUCTION

Neither Health Insurance King Agency, LLC (**HIK**) nor Alvarado Marketing Group, Inc. placed the calls that underlay Plaintiff's TCPA claim. Nor did they have any agency relationship with Health Choice Now or ratify any TCPA violations. And Plaintiff has no evidence indicating otherwise and will never possess such evidence.

Plaintiff's goal is to keep HIK and Alvarado in this case in a jurisdiction far from their place of business in Texas long enough to force settlement payments from them. This Court has already given Plaintiff ample opportunity to uncover any basis to hold HIK or Alvarado liable under the TCPA. Indeed, the Court did so with regard to Alvarado even before Alvarado was a party to this case.

Plaintiff has abandoned the assertion in his initial Complaint that HIK made calls directly to Plaintiff, the very basis on which this Court initially denied HIK's motion to dismiss. Plaintiff did so because of the substantial evidence, much of which has not yet been presented to this Court, that HIK merely received inbound calls and never made any outbound call to Plaintiff. Of course, this indicates that Plaintiff's assertion to the contrary—which the Court accepted in denying dismissal of HIK—was false. HIK and Alvarado are not asking the Court to directly consider the problems with Plaintiff's prior positions/testimony as part of this motion. There is no need to do so. Plaintiff is not in a position to provide any evidence as to Alvarado's direct liability, or the alleged liability of HIK or Alvarado based on agency or ratification. But they are requesting that the Court consider those circumstances when deciding whether to give Plaintiff a further

opportunity to find the nonexistent evidence that would support liability against HIK or Alvarado.

The applicable pleading and evidentiary standards do not support personal jurisdiction against HIK or Alvarado. They should be dismissed from this proceeding.

## II.    FACTUAL BACKGROUND

HIK is a Texas entity with its principal place of business in Texas. (Subia Decl. Ex. A ¶ 2.) It does not do any business in Iowa, nor consented to be sued in Iowa. (*Id.*)

Alvarado is a Texas entity with its principal place of business in Texas. (Alvarado Decl. Ex. B ¶ 2.) It does not do any business in Iowa, has never consented to be sued in Iowa, and has never intentionally placed a phone call to anyone in Iowa. (*Id.*)

Plaintiff alleges that he received three calls on November 25, November 26, and December 2, 2024. (Am. Compl. ¶¶ 29–37.) He alleges that the first two calls were unanswered and that he answered the third call. (*Id.*) He claims that all three calls were placed to him by either Health Choice Now or Alvarado. (*Id.*) Plaintiff does not, and cannot, have any evidence supporting the first two calls being placed being placed by any defendant on November 25 and November 26. He did not answer the calls, so he could not have any knowledge about who purportedly made them. And the efforts Plaintiff has undertaken to uncover the owner of the numbers from which the calls were made has not yielded anything.

HIK is a health insurance agency. (Subia Decl. Ex. A ¶ 2.) It does not place outbound calls to non-customers, and the phone numbers

identified in Plaintiff's Amended Complaint—563-888-1294, 563-888-1567, and 563-888-8621—are not numbers owned by or assigned to HIK for outbound calling. HIK does not own or use 563-area-code numbers to place calls. (*Id.* ¶ 4.) It did not make any phone calls to the Plaintiff on November 25, November 26, or December 2, 2024. (*Id.* ¶ 2.)

Alvarado does not itself place calls to consumers. (Martinez Decl. Ex. B ¶ 10.) Instead, it contracts with independent company customers like HIK to provide call transfers that Alvarado transfers to its customer. (*Id.* Martinez Decl.¶ 5.) And it does not own or otherwise have access to any of the phone numbers with Iowa area codes identified by Plaintiff as being the source of calls to Plaintiff. (*Id.*) Alvarado has confirmed that it received transfers of multiple calls the phone number associated with Montwain Carter identified in HIK's records on December 2 and December 3, 2024 and transferred those inbound calls to HIK. (*Id.* ¶ 11.)

Alvarado's call transfers were done under an Advertiser Agreement with HIK effective November 1, 2024. (*Id.* ¶ 6; Advertiser Agreement, Ex. B1.) Under that agreement, Alvarado's role was to deliver "Leads, Calls, and Redirects.". (*Id.*) Alvarado never acted as HIK's agent. (Martinez Decl. Ex. B ¶ 12.) The relationship between the parties involves independent contractors, not an agent-principal relationship. (*Id.* ¶ 13.)

Alvarado also had a separate marketing relationship with Health Choice Now, LLC which is governed by two applicable contract documents: one entitled "Health Choice Now, LLC Terms and Conditions for Sales" and the other entitled "Insertion Order-Health Choice Now, LLC." (*Id.* ¶ 8.) Under the terms of those contracts, Health

Choice Now agreed to deliver "Calls" [as call transfers] to Alvarado associated with individuals interested in health insurance. (*Id.* ¶ 9; Contracts, Ex. B2.) Alvarado would not place any calls itself, but would rather receive calls as transfers and route the calls directly to HIK phone numbers for the calls to be answered by HIK personnel. (Martinez Decl. Ex. B ¶ 9.)

Health Choice Now never acted as an agent for Alvarado or HIK. (Martinez Decl. Ex. B ¶ 13.) In fact, the terms of the contract between Health Choice Now and Alvarado clearly state that the Health Choice Now and Alvarado are independent contractors and not agents of one another. (*Id.*; Contracts, Ex. B2 at ¶ 12.B.)

## III.    ARGUMENTS AND AUTHORITIES

A plaintiff has the burden of proof on the issue of personal jurisdiction, which it must establish by a preponderance of evidence at trial or when the trial court holds an evidentiary hearing. *Creative Calling Sols., Inc. v. LF Beauty Ltd.*, 799 F.3d 975, 979 (8th Cir. 2015). Prior to such a trial or hearing, the trial court can rely upon evidence submitted with a motion to dismiss under effectively the same standard applicable to summary judgments. *Id.* The court must determine whether the evidence could lead a reasonable factfinder to conclude that personal jurisdiction exists. *Id.* at 980.

To support personal jurisdiction, a plaintiff must state sufficient facts in the complaint to support a reasonable inference that the defendant can be subjected to jurisdiction within the state where the district court sits. *Dever v. Hentzen Coatings, Inc.*, 380 F.3d 1070, 1072–73 (8th Cir. 2004). But when personal jurisdiction has been controverted

or denied by a motion to dismiss, the plaintiff has the burden to prove the facts supporting jurisdiction. *Id.*

The plaintiff must make a prima facie showing that (1) the complaint alleges sufficient non-conclusory facts on which personal jurisdiction against a defendant can rest; and (2) evidence—through affidavits and exhibits—supporting those facts. *Id.*; *High Plains Const., Inc. v. Gay*, 831 F. Supp. 2d 1089, 1094–95 (S.D. Iowa 2011). While any factual conflicts supported by evidence are resolved in favor of the plaintiff, the plaintiff has the burden to present pleadings and evidence to reach that point. *Id.*; *Shine Bros. Corp. v. Am. Intern. Group, Inc.*, 108 F. Supp. 3d 651, 658–59 (N.D. Iowa 2015).

**A. This Court has no general personal jurisdiction over HIK or Alvarado.**

A court has general personal jurisdiction over a defendant for a claim in a state—regardless of whether the facts associated with the claim are connected to the state—in a state in which an entity is incorporated or has its principal place of business. *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 137–40 (2023). General jurisdiction can also exist if an entity has consented to be sued in a state for any particular claim. *Id.*

But none of those bases for general jurisdiction are present in this case. HIK is a Texas entity with its principal place of business in Texas. (Subia Decl. Ex. A ¶ 2.) It does not do any business in Iowa and has never consented to be sued in Iowa. (*Id.*) Alvarado is likewise a Texas entity with its principal place of business in Texas. (Martinez Decl. Ex. B ¶ 2.) It does not do any business in Iowa and has never consented to be sued in Iowa. (*Id.*) Moreover, Plaintiff's amended complaint does not

even allege that this Court has general jurisdiction in its complaint. (Am. Compl. ¶ 11.) Therefore, there is no basis for general personal jurisdiction over HIK or Alvarado.

**B. This Court has no specific personal jurisdiction over HIK or Alvarado based on them making any phone calls to Plaintiff.**

A Court has specific personal jurisdiction over a defendant if the defendant has purposely directed legally sufficient activities at forum residents, and the litigation results from injuries arising out of, or relating to, those activities. *Burlington Indus., Inc. v. Maples Indus., Inc.*, 97 F.3d 1100, 1102–03 (8th Cir. 1996). Ordinarily, a handful of phone calls or messages placed to a state will not be sufficient for specific personal jurisdiction. *Id.*

Many federal courts have held that such minimal contacts are sufficient when involving TCPA claims like the one asserted by Plaintiff. *See, e.g., Lowe v. CVS Pharmacy, Inc.*, 233 F. Supp. 3d 636, 645 (N.D. Ill. 2017) (phone calls); *Northrup v. Innovative Health Ins. Partners*, LLC, No. 8:17-CV-1890-T-36JSS, 2018 WL 1726436, at *2–3 (M.D. Fla. Apr. 10, 2018) (text messages). However, central to such decisions is that those defendants could not deny that they had made the calls or sent the messages. *See, e.g. Luna v. Shac*, LLC, No. C14-00607 HRL, 2014 WL 3421514, at *3–4 (N.D. Cal. July 14, 2014) (collecting similar cases).

But a different result is appropriate when a defendant has contested making calls or sending messages and (if applicable any conduct attributing similar actions by others to them). For example, a Texas federal court dismissed an entity defendant named WMI based on lack of personal jurisdiction because WMI denied making or authorizing

the calls on which the plaintiff's TCPA claims were based and the plaintiff could not offer evidence that WMI made the calls. *Callier v. Wide Merch. Inv., Inc.*, 671 F. Supp. 3d 736, 743 and 747 (W.D. Tex. 2023). In that case, the calls had been made by an entity named Synergy with which WMI had an independent contractor relationship. *Id.* at 744. As a result, there was no basis for personal jurisdiction over WMI based on it making the phone calls. *Id.* at 743.

HIK previously moved the Court to dismiss based on lack of personal jurisdiction. The Court denied the motion based on Plaintiff's testimony that an employee for HIK placed at least one call to Plaintiff. (Order, Dkt. # 29 at 4-5.) But, as Plaintiff's own amended pleading now concedes, HIK did not, in fact, place any call to Plaintiff. (Am. Compl. ¶¶ 29, 32.) Indeed, Plaintiff moved to compel discovery about HIK's "vendors" involved in the calls with Plaintiff and to extend the deadline to add defendants before the Court even ruled on HIK's motion. (Plaintiff's Motion to Compel, Dkt. # 27 at 8, 11.) Even before the Court denied the motion to dismiss, Plaintiff's counsel understood the substantial evidence—including recordings of four[1] calls—that conflicted with Plaintiff's assertion that HIK made the calls to Plaintiff. The Court granted the motion to compel, in part, which allowed Plaintiff to obtain evidence related to the role of Alvarado and Health Choice Now

---

[1] At the time the Subia Declaration was submitted with HIK's motion to dismiss, HIK had not located any calls from Plaintiff, leading the declaration to state that there were no such calls. On further review, HIK found four recordings of calls that had no name associated with them. There was no name inputted for those calls because they were short and did not involve meaningful customer interaction. It was likely these call recordings that led Plaintiff to pursue other potential defendants. Notably, Plaintiff has, to date, failed to acknowledge three of the four calls for which recordings exist. These recordings can be made available to the Court at an evidentiary hearing if necessary, but given the modification of Plaintiff's contentions relating to HIK, it is likely unnecessary.

in relation to calls involving Plaintiff and led to their addition as defendants. (Order, Dkt. 37.)

Given basis for this Court's prior ruling on personal jurisdiction of HIK—and the changed circumstances acknowledge by Plaintiff— there is no basis for personal jurisdiction over HIK based on HIK's employee placing the calls. However, if Plaintiff attempts to rely upon evidence that contradicts its pleading, then HIK requests that the Court hold an evidentiary hearing at which the Court can listen to the call recordings and hear live testimony from the Plaintiff to determine whether a preponderance of the evidence supports jurisdiction.

As for Alvarado, Plaintiff alleges that it was either Alvarado or Health Choice Now that made the calls, but Plaintiff has no evidence that Alvarado made any calls. Alvarado's testimony demonstrates that it never made a single call to Plaintiff or anyone else whose call was transferred to HIK and has no access to any of the phone number from which Plaintiff alleges the calls were made. (Martinez Decl. Ex. B ¶ 10.) Further, Alvarado's records establish that there were multiple calls *transferred to Alvarado*, which Alvarado transferred to HIK. (*Id.* ¶ 11.) Furthermore, there are contracts between Alvarado, HIK, and Health Choice Now that effectively establish Alvarado as a mere middleman. (Advertiser Agreement, Ex. B1; Contracts, Ex. B2.) It would be absurd for Alvarado to place calls it had contracted to pay Health Choice Now to transfer to it. And Plaintiff could not possibly offer competent testimony that any employee of Alvarado made the calls given that Plaintiff did not know Alvarado existed until HIK disclosed information about Alvarado in this litigation.

As a result, there is no basis from which the Court could conclude that HIK or Alvarado placed any calls to Plaintiff sufficient to support personal jurisdiction in this case.

### C. This Court has no specific personal jurisdiction over HIK or Alvarado based on them being agents for Health Choice Now.

A court in the Eighth Circuit can obtain personal jurisdiction over an entity as a result of calls placed by another entity on the basis of an agency relationship. *Day v. Renny*, No. 8:20CV104, 2020 WL 13002519, at *3 (D. Neb. July 24, 2020). But a plaintiff relying on that basis for personal jurisdiction has the burden of proving both the fact of the agency relationship and the scope of the agent's authority. *Id.*; *Romak USA, Inc. v. Rich*, 384 F.3d 979, 985 (8th Cir. 2004). In *Day*, the trial court dismissed the Matrix Defendants, who had a vehicle service contract with the plaintiff, because the plaintiff had no evidence of an alleged agency relationship between National Car, who made the calls, and the Matrix Defendants. *Day*, 2020 WL 13002519, at *4. The fact that there was a contract permitting National Care to sell vehicle service contracts of the Matrix Defendants was not sufficient. *Id.*

The previously discussed *Callier* case reached a similar result. *Callier*, 671 F. Supp. 3d at 743 and 747. The plaintiff attempting to establish personal jurisdiction over WMI based on an agency relationship failed because the plaintiff had neither alleged facts nor provided evidence sufficient to conclude that the conduct of Synergy could be attributed to WMI based on an agency relationship. *Id.* at 744-47. *Callier* contrasted the mere independent contractual relationship between Synergy and WMI with the facts of a different case finding

agency where a company had contractual rights to direct a telemarketing company, had given the telemarking company a script, and had other rights indicating substantial control over the telemarketing company. *Id.* at 745.

A similar decision dismissing TCPA defendants based on personal jurisdiction was made by a federal court in North Carolina. *Cunningham v. Autoguard Advantage Corp.*, No. 323CV00238FDWSCR, 2024 WL 818381, at *7 (W.D.N.C. Feb. 27, 2024). In *Cunningham*, the plaintiff tried to establish personal jurisdiction over three other entities for calls placed by a fourth one named AAP based on asserted vicarious/agency liability. *Id.* There was some connection between two of the entities and AAP because they were identified on a car warranty policy sold by AAP. *Id.* But those other entities had denied making the calls or authorizing them and the plaintiff had not alleged or proved sufficient facts to attribute AAP's conduct to them. *Id.*

Other federal courts have reached similar decisions. *Moore v. Charter Communications, Inc.*, 523 F. Supp. 3d 1046, 1051–53 (N.D. Ill. 2020); *Kline v. Advanced Ins. Underwriters, LLP*, No. 1:19-CV-00437, 2020 WL 14028040, at *5 (M.D. Pa. June 23, 2020), *report and recommendation adopted sub nom. Kline v. Advanced Ins. Underwriters, LLC*, No. 1:19-CV-00437, 2020 WL 14028041 (M.D. Pa. July 10, 2020).

While these decisions are not binding on this Court, they should be persuasive. They provided substantial and reasonable justifications for their decisions and federal court decisions relating to personal jurisdiction in TCPA cases have tended to be consistent across jurisdictions.

The logic in these decisions, when applied to the facts in this case, demonstrate that there is no specific personal jurisdiction over HIK nor Alvarado. Plaintiff's Amended Complaint contains formulaic recitations of factors supposedly supporting an agency relationship such as them being "vicariously liable," having "full knowledge," and "fail[ing] to supervise." (Am. Complaint, Dkt. # 45 ¶¶ 48-57.) But the few facts specific to HIK or Alvarado mentioned by Plaintiff do not support HIK having the type of control over Alvarado or Health Choice Now or Alvarado having the type of control over Health Choice Now to create an agency relationship. Indeed, such general allegations are not even sufficient to properly plead an agency relationship under the TCPA. *Sundermann v. Golden Circle Real Estate Group, L.L.C.*, No. 4:19-CV-00140, 2019 WL 7758601, at *3 (S.D. Iowa Oct. 29, 2019). But, regardless, Plaintiff has no evidence to support any such basis for agency status.

Plaintiff also quotes select phrases from the relevant contracts as support for an agency relationship. (Am. Complaint, Dkt. # 45 ¶¶ 48-57.) But the actual contracts do not support Plaintiff's "interpretation." The contract between HIK and Alvarado does not indicate that Alvarado is subject to HIK's control as an agent would be. (Advertiser Agreement, Ex. B1.) HIK does not have any control over how Alvarado acquires the leads, calls, or redirects it agreed to provide to HIK—the choice of which depends on a specific insertion order. (*Id.*) Alvarado does agree to comply with applicable laws, such as the TCPA, but this promise is hardly sufficient to create an agency relationship, especially given that HIK made a similar promise to Alvarado. (*Id.* at ¶ 3.) Alvarado never acted

as HIK's agent and was not requested to do so.  (Martinez Decl. Ex. B ¶ 12.)

As for the applicable insertion order, it is a one-page agreement between Alvarado and Health Choice now that specifies basic terms of the agreement, such as type of deliverable and pricing. (Contracts, Ex. B2 at 1.) Nor do the terms and conditions applicable to that contract give Alvarado (or HIK) control over how Health Choice Now will generate the call transfers. It does contain promises to comply with the law, including the TCPA, and also restricts use of the information yielded by the call transfer. (Contracts, Ex. B2 at ¶ 4.A.) But importantly, both parties make similar promises. (*Id.*) And the parties themselves expressly agreed that their relationship was only one of independent contractors (i.e. no agency relationship). (*Id.* at ¶ 12.B.) And Health Choice Now never acted as the agent for Alvarado or HIK and was never requested to do so. (Martinez Decl. Ex. B ¶ 13.)

This Court is not required to accept Plaintiff's interpretation of contracts to which he was not a party. A review of the actual contract terms demonstrates that they are no different than would be expected from any independent contractual relationship involving the purchase of products or services. Indeed, under Plaintiff's "interpretation" any contract would create an agency relationship between the parties, upending the legal relationships—and the limitations on those relationship—that govern everyday economic activity. The contract terms in this case are also comparable to those in *Day*, *Callier*, and similar cases that concluded there was insufficient evidence of an agency relationship. And they are not similar to the contractual terms in cases

that have found sufficient evidence of an agency relationship, such as those discussed in *Callier*.

Ultimately, there is no basis on which to conclude that Health Choice Now was the agent for Alvarado or HIK and there is no basis to conclude that Alvarado was the agent for HIK. Thus, there is no basis for personal jurisdiction.

### D. This Court has no specific personal jurisdiction over HIK or Alvarado based on them ratifying any conduct of Health Choice Now.

One entity's ratification of conduct by another entity is a potential basis for personal jurisdiction. *Day*, 2020 WL 13002519, at *4. But that must involve assent or conduct supporting that ratification and knowledge of the material facts involved. *Id.* Plaintiff's Amended Complaint alleges that HIK ratified the acts of Alvarado or Health Choice Now, but does not explain what knowledge HIK had or exactly what conduct amounts to ratification. (Am. Complaint ¶¶ 69-73.) Because Plaintiff contends—without any evidence—that Alvarado made calls to Plaintiff, it does not even allege that it ratified any actions of Health Choice Now. But the pleading is similarly devoid of any specificity as to the knowledge Alvarado had or the conduct that could amount to ratification.

The only thing Alvarado did is receive an inbound call and transfer it to HIK. Th only thing HIK did is answer in inbound call transferred to it. The available case law indicates that a subsequent contractual relationship between a plaintiff and HIK would not have been enough to establish ratification, but that nonetheless did not occur here. If Health Choice Now violated the TCPA as Plaintiff alleges, then

how was either HIK or Alvarado supposed to know that fact prior to receiving the call transfer. Indeed, Plaintiff does not explain how HIK or Alvarado could have known about the TCPA violation even after the fact, at least until they received notice of Plaintiff's suit.

Plaintiff seems to be contending that HIK or Alvarado's mere acknowledgment of the possibility Health Choice Now could violate the TCPA and inclusion of contractual provisions in the contracts to discourage such conduct and address such a situation if it happens somehow ratify that same disapproved conduct. But that does not make any sense. There is no evidence that HIK or Alvarado knew Health Choice Now had violated the TCPA with regard to Plaintiff or anyone else—assuming Health Choice Now actually did so—nor that HIK or Alvarado approved or accepted such conduct. Indeed, there was never even any opportunity for HIK or Alvarado to do so prior to them receiving notice of Plaintiff's suit. And neither of them have indicated any approval of violations of the TCPA that may have occurred during this suit. There simply is no evidentiary basis for this Court to conclude there is personal jurisdiction over HIK or Alvarado based on ratification.

## IV.   CONCLUSION AND PRAYER

Based on the pleadings, evidence and argument detailed above, there is no basis for personal jurisdiction over Defendants HIK or Alvarado. Therefore, HIK and Alvarado request that this Court dismiss the lawsuit against them.

Respectfully submitted,

**SPENCER FANE LLP**

By: */s/ Brian W. Zimmerman*
Brian W. Zimmerman
(Admitted *Pro Hac Vice*)
bzimmerman@spencerfane.com
Nicholas J. Reisch
(Admitted *Pro Hac Vice*)
3040 Post Oak Blvd., Suite 1400
Houston, Texas 77056
Phone: (713) 552-1234
nreisch@spencerfane.com

Tara E. Holterhaus, AT0013780
Spencer Fane LLP
13815 FNB Parkway, Suite 200
Omaha, NE 68154
Phone: (402) 501-6770
tholterhaus@spencerfane.com

**ATTORNEYS FOR
DEFENDANTS HEALTH
INSURANCE KING AGENCY,
LLC AND ALVARADO
MARKETING GROUP, INC.**

## CERTIFICATE OF SERVICE

The undersigned, an attorney, states that he caused the foregoing to be served upon all counsel of record via electronic case filing procedures on April 28, 2026.


*/s/ Tara E. Holterhaus*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | |
|---|---|
| MONTWAIN CARTER, individual and on behalf of all other similarly situated<br><br>Plaintiff,<br><br>v<br><br>HEALTH INSURANCE KING AGENCY, LLC<br><br>Defendant. | NO. 3:25-cv-00005-SHL-WPK<br><br>DECLARATION OF YGNACIO SUBIA |

1.    My name is Ygnacio Subia. I am over the age of 18 and am capable of making the following declaration. I am a supervisor for Health Insurance King, LLC and it is my status as supervisor that gives me the personal knowledge of the facts in this declaration.

2.    Health Insurance King is a health insurance agency. It is a Texas limited liability company with its principal place of business in Mansfield, Texas. It has never consented to being sued in Iowa.

3.    Neither Health Insurance King nor any of its employees made phone calls to Montwain Carter on November 25, November 26, or December 2, 2024.

4.    It is not possible for those phone calls to originate from Health Insurance King. None of the phone numbers identified by Mr. Carter's lawsuit—563-888-1294, 563-888-1567, or 563-888-8621—are phone numbers owned by or otherwise available to Health Insurance King for making phone calls. In fact, Health Insurance King does not own and has not been assigned any phone numbers with a 563 area code.

**Exhibit A**

5.      Also, there is no record in Health Insurance King's CRM (Customer Relations Management) database of any call between any Health Insurance King employee and a phone number with a 563 area code on November 25, November 26, or December 2. The database is designed to log any such call, whether it is outgoing or ingoing. If there had been such a call between Health Insurance King employees and Mr. Carter, it would be reflected in the database.

6.      In addition, the calls alleged by Mr. Montwain could not have come from Health Insurance King because Health Insurance King does not initiate outgoing calls to non-customers. A substantial majority of Health Insurance King phone traffic are inbound calls. The minority of outbound calls are limited to calls made to current customers or customers that cancelled their products in the last 30 days.

7.      Mr. Carter does not fit either category because he is not in Health Insurance King's CRM database and he would necessarily be in that database if he fit one of those categories. And he would have to be in the CRM database for a Health Insurance King employee to have his phone number to make an outbound call to him.

8.      There is an individual named Timothy Reese—who Mr. Carter alleges made a call to him—employed by Health Insurance King. But the Timothy Reese associated with Health Insurance could not have placed any of the calls alleged by Mr. Carter from the Health Insurance King system for the reasons I have explained.

9.      There is no reason for Mr. Reese to have placed a call to Mr. Carter from outside the Health Insurance King system. But even assuming he—or someone else claiming to be him—did so, they were not authorized to do so by Health Insurance King. Health Insurance King

**Y. Subia Decl.**                                                    **Page 2**

prohibits its employees from making calls to customers outside of its system. Health Insurance King also prohibits its employees from making outbound calls to anyone that is not a customer or recently cancelled customer because only those groups have consented to Health Insurance King's calls.

I declare under penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct.

Executed on February 25, 2025 in Mansfield, Texas.

_____
Ygnacio Subia

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA EASTERN
DIVISION**

| | |
|---|---|
| **MONTWAIN CARTER,** individual and on behalf of all other similarly situated <br><br>    **Plaintiff,** <br><br> **v** <br><br> **HEALTH INSURANCE KING AGENCY, LLC, ALVARADO MARKETING GROUP, INC, AND HEALTH CHOICE NOW, LLC** <br><br>    **Defendants.** | **NO. 3:25-cv-00005-SHL-WPK** |

**DECLARATION OF IRENA MARTINEZ**

1. My name is Irena Martinez. I am over eighteen (18) years of age, of sound mind, and capable of making this declaration. The facts stated within this declaration are within my personal knowledge because I am the CEO of Alvarado Marketing Group, Inc and have reviewed Plaintiff's Amended Complaint filed on February 26, 2026 [Doc. 45].

2. Alvarado Marketing is a corporation organized under the laws of the State of Texas with its principal place of business in Mansfield, Texas. It has never consented to being sued in Iowa and does not do any business in Iowa. It has never intentionally placed any calls to anyone in Iowa and is not aware of ever placing a call to anyone in Iowa.

3. Alvarado Marketing acquires, generates, and licenses certain consumer information, transfers inbound calls from consumers expressing an interest in insurance products, and redirects users from its publish network to advertiser sites.

4. Alvarado Marketing is a small business with one employee.

---

**DECLARATION OF IRENA MARTINEZ**                 **PAGE 1 OF 3**

**Exhibit B**

5. Alvarado Marketing does not place or transfer calls to potential customers itself. Rather, it contracts with independent companies to provide call transfers to other companies.

6. Alvarado Marketing has a contract with Health Insurance King Agency, LLC entitled "Alvarado Marketing Group, Inc. Advertiser Agreement" dated November 1, 2024. Alvarado's responsibility under the agreement is to "deliver Leads, Calls, and Redirects[.]" An accurate copy of that contract is included with this Declaration as Exhibit B1.

7. To fulfil its responsibility to Health Insurance King, Alvarado Marketing contracted with Health Choice Now. There are two applicable contract documents: "one entitled "Health Choice Now, LLC Terms and Conditions for Sales" and the other entitled "Insertion Order-Health Choice Now, LLC. An accurate copy of those contracts is included with this Declaration as Exhibit B2.

8.  Under the terms of the contracts, Health Choice Now was requested solely to deliver "Calls" to Alvarado associated with individuals interested in health insurance. The terms of the agreement specify that these calls will be delivered to Alvarado as call transfers. Thus, the contract envisioned calls to be transferred to Alvarado and did not involve Alvarado placing any calls. The terms also place responsibility on Health Choice Now to ensure that any consent for the call be obtained from the individuals interested in health insurance.

9. All the information available to Alvarado indicates that all the calls provided by Health Choice Now were consistent with this contract. Alvarado did not place any calls, but merely had calls transferred to it by Health Choice Now and then Alvarado routed those calls directly to Health Insurance King phone numbers where Health Insurance King personnel would answer the inbound calls.

10. Alvarado did not place any phone calls to Montwain Carter or any other person. It does not place any of the phone calls it transfers to Health Insurance King. Further, none of the phone numbers identified by Mr. Carter's lawsuit—563-888-1294, 563-888-1567, or 563-888-8621—are phone numbers owned by or otherwise available to Alvarado.

11. I have confirmed that Alvarado's record of transferred calls, which have been produced by Alvarado to the Plaintiff in this case, includes multiple calls transferred to Health Insurance King from the phone number for Montwain Carter with a 563-area code that was located in Health Insurance King's call records after Health Insurance King reviewed the call records and found the recordings of calls with Montwain Carter. All those

---

**DECLARATION OF IRENA MARTINEZ**                                      **PAGE 2 OF 3**
**Declaration-Alvarado Marketing(7084016.3) - 4/26/2026 5:44 PM**

calls were on December 2 and December 3, 2024. This confirms that all calls between Health Insurance King and Montwain Carter were inbound calls transferred by Alvarado to Health Insurance King. There was no record of any calls on November 25 and November 26, 2024 associated with Mr. Carter's number.

12. Under its contract with Health Insurance King, Alvarado did not act as agent for Health Insurance King for any purpose. In fact, the agreement between them states that the only relationship between the parties is one of independent contractors. Further, Alvarado never acted as Health Insurance King's agent outside of that agreement, nor was it requested to do so. Its sole involvement was to provide Health Insurance King with call transfers under the contract.

13. In addition, under Alvarado's contract with Health Choice Now, Health Choice Now did not act as Alvarado's or Health Insurance King's agent. In fact, that contract also confirms that the relationship between Alvarado and Health Choice Now is one of independent contractors. Further, Health Choice Now never acted as Alvarado's or Health Insurance King's agent outside of that agreement, nor was it requested to do so. The sole connection between Health Choice Now and Alvarado or Health Insurance King was to provide call transfers to Alvarado that Alvarado would redirect to Health Insurance King.

I declare under penalty of perjury that the foregoing statements are true and correct. Executed in __Harris___ County, State of Texas, on the _27_ day of _April__ 2026.


_____
Irena Martinez

# Alvarado Marketing Group, Inc.
## Advertiser Agreement

This Advertiser Agreement (the "Agreement") is made and entered into as of _____, 2025 (the "Effective Date") by and between Alvarado Marketing Group, Inc., a Texas corporation ("Alvarado"), and Health Insurance King, Inc., a Texas corporation with an address at 1900 Matlock Rd., Suite 500, Mansfield, TX 76063 ("HIK"). Alvarado and HIK may each be referred to herein individually as a "Party" and collectively as the "Parties."

WHEREAS, Alvarado is in the business of acquiring, generating, and licensing certain consumer information ("Lead Data"), transferring inbound calls from consumers expressing an interest in insurance products ("Calls"), and redirecting users from its publisher network to advertiser sites ("Redirects"); and

WHEREAS, HIK desires to engage Alvarado to provide such Leads, Calls, and/or Redirects subject to the terms of this Agreement;

NOW, THEREFORE, the Parties agree as follows:

## 1. Definitions

"Agreement" means this Advertiser Agreement, including any Insertion Orders ("IOs").

"Lead Data" or "Lead" means information relating to a consumer expressing interest in obtaining insurance products.

"Call" means a consumer telephone call generated and transferred by Alvarado pursuant to an IO.

"Redirect" means a user forwarded by hyperlink or other method from a site in Alvarado's publisher network to HIK's site.

"Compensable Transactions" means the net number of Leads, Calls, and Redirects delivered pursuant to an IO, less any accepted returns.

"Confidential Information" means non-public information disclosed by one Party to the other, including consumer data.

"PII" means personally identifiable information of consumers.

"TCPA" means the Telephone Consumer Protection Act, 47 U.S.C. § 227 et seq.

## 2. Insertion Orders

Each engagement shall be subject to an executed IO. IOs will specify campaign details including pricing, vertical, filters, state/geography, volume caps, exclusivity, and return policies. In case of conflict, the Agreement controls unless the IO expressly overrides.

**Exhibit B-1**

HIK 000021

**Alvarado Marketing Group, Inc.**
**Advertiser Agreement**

## 3. Responsibilities of the Parties

3.1 Alvarado Responsibilities: Alvarado shall deliver Leads, Calls, and Redirects as set forth in the IO using lawful methods and in compliance with applicable laws, including TCPA, TSR, CAN-SPAM, and state insurance marketing laws.

3.2 HIK Responsibilities: HIK shall use Leads, Calls, and Redirects solely to provide insurance quotations. HIK shall not misuse consumer data, shall honor consumer opt-outs, and shall comply with all applicable laws.

## 4. Financial Terms

HIK shall pay fees as specified in each IO. Invoices are due within thirty (30) days. Disputes must be raised within seven (7) days. Late payments accrue interest at 1.5% per month or the maximum lawful rate.

## 5. Intellectual Property

Each Party retains ownership of its intellectual property, including consumer data generated. Leads remain property of Alvarado, licensed to HIK for permitted use.

## 6. Confidentiality

The Parties shall keep Confidential Information secret and use it only to perform this Agreement. Confidentiality obligations survive termination for five (5) years.

## 7. Term and Termination

This Agreement remains effective until terminated by either Party upon thirty (30) days written notice, or immediately for material breach.

## 8. Indemnification

Each Party agrees to indemnify and hold harmless the other from losses arising from breach of this Agreement or violations of law. Alvarado specifically indemnifies HIK for violations of TCPA or misrepresentations in lead generation.

## 9. Disclaimer; Limitation of Liability

Deliverables are provided 'as is.' Except for indemnification obligations, neither Party shall be liable for indirect, incidental, or consequential damages. Aggregate liability shall not exceed the fees paid under the applicable IO in the prior three (3) months.

## Alvarado Marketing Group, Inc.
## Advertiser Agreement

### 10. Miscellaneous

This Agreement shall be governed by Texas law, with venue in Tarrant County, Texas. Parties are independent contractors. This Agreement, including IOs and Addenda, constitutes the entire agreement.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

**HIK**                                      **Alvarado**

_Ygnacio Subia_

Signature                                    Signature

VP Of Sales Operations                       President

Title                                        Title

11/01/2024                                   11/1/2024

Date                                         Date

Docusign Envelope ID: FE6C4EC4-41A3-41AD-9942-180E5B49C879

**INSERTION ORDER - Health Choice Now, LLC**

| Company: Health Choice Now, LLC | | Advertiser: Alvarado Marketing Group | |
|---|---|---|---|
| **Primary Contact** | **Billing Contact** | **Primary Contact** | **Billing Contact** |
| Name: Eric Feinman | Name: Tonya Farmer | Name: Jess Jordan | Name: jESS jORDAN |
| Email: eric@healthchoicenow.com | Email: finance@healthchoicenow.com | Email: JJordan@alvaradomedia.tech | Email: jJORDAN@ALVARADOMEDIA.TE |
| Phone: | Phone: | Phone: | Phone: |
| Address: 250 W Lake Mary Blvd. Unit #6008, Sanford, FL 32773 | Address: 250 W Lake Mary Blvd. Unit #6008, Sanford, FL 32773 | Address: 5100 Matlock rd. Mansfield Texas 76063 suite 500 | Address: |

| Campaign Details | |
|---|---|
| **Campaign Name:** | ACA / Medicare Advantage |
| **Campaign Type:** | Warm Transfers |
| **Deliverable:** | ☐ Clicks      ☐ Leads      X☐ Calls      ☐ Other: |
| **Time Period:** | |
| **Total Cap:** | none |
| **Rate Model:** | Duration |
| **Rate (USD$):** | $25 ACA \| $35 Medicare |
| **Max Scrub Rate:** | N/A |
| **Total Budget:** | N/A |
| **Conversion Point:** | ACA: 60 SEC Medicare: 120 SEC |
| **Required Fields:** | N/A |
| **Campaign Geo:** | Provided by client |

| Insertion Order Special Terms |
|---|
| A.      This Insertion Order ("IO") shall be governed by and incorporated into the Health Choice Now, LLC Terms and Conditions for Sales entered into by the parties on or about [11.13.24] (the "Terms"). Capitalized terms not defined in this IO shall have the same meaning, if any, assigned to them in the Terms. If there is conflict between the Terms and this IO, this IO shall govern to the extent necessary to resolve such conflict. |
| B.      Campaign Details (except for Deliverable) may be amended by confirmed emails or change order(s) exchanged by authorized representatives of each party. |
| C.      Deliverables not contested within ten (10) days shall be indisputable. |
| D.      For the avoidance of doubt, these terms shall supersede any click-wrap, click-through, or other online agreement that either party may present or navigate through in conjunction herewith. |

**IN WITNESS WHEREOF,** the parties have caused this IO to be duly executed as of the last date below.

| Company: Health Choice Now, LLC | | Advertiser: Alvarado Marketing Group | |
|---|---|---|---|
| **Signature:** | *Eric Feinman* | **Signature:** | *Jess Jordan* |
| **Name:** | Eric Feinman | **Name:** | Jess Jordan |
| **Title:** | President | **Title:** | dIIRECTOR OF oPERATIONS |
| **Date:** | 11/14/2024 | **Date:** | 11/13/2024 |

**Exhibit B-2**

HIK 000013

Docusign Envelope ID: FE6C4EC4-41A3-41AD-9942-180E5B49C879

**HEALTH CHOICE NOW, LLC**
**TERMS AND CONDITIONS FOR SALES**

These Terms and Conditions For Sales ("Terms") are entered into by and between Health Choice Now, LLC, a New Jersey limited liability company, or its affiliated entity as specified on an applicable insertion order ("IO"), with an address of 250 W Lake Mary Blvd. Unit #6008, Sanford, FL 32773, ("Company") and [Alvarado Marketing Group], a [Texas] [LLC] with its principal place of business at [5100 Matlock rd. Mansfield Texas 76063 suite 500] ("Advertiser"). These Terms shall govern any IO to which they are attached or that incorporate by reference these Terms. If there is conflict between these Terms and an IO, the IO shall govern to the extent necessary to resolve such conflict. These Terms are effective as of the date that they are signed by all parties (the "Effective Date").

1.  **General.**

Company shall generate and deliver to Advertiser impressions, clicks, leads, call transfers, or other actions (collectively, "Actions"), and/or distribute banners, buttons, text-links, clicks, co-registrations, pop-ups, e-mails, texts, graphic files and other media (collectively, "Creatives") (Actions and Creatives may be referred to collectively as "Deliverables"), as specified in one or more IO(s) (the "Services"). Neither Company nor Advertiser shall have any minimum obligation hereunder, unless specifically set forth in an IO.

2.  **Tracking/Payment.**

   **A.  Fees and Payment.**    Advertiser shall pay Company fees for Services as specified in the IO ("Fees"). Unless otherwise specified in an IO, Advertiser shall be responsible for tracking of all Services, which tracking may be made available to Company through online access to a real-time tracking platform. In the event of a malfunction of Advertiser's tracking methods, the parties shall use good-faith efforts to establish the appropriate Fees. Unless otherwise specified in an IO: (i) If tracking and reporting is not provided in real-time, tracking and reporting will be due monthly within three (3) business days of the end of such month; (ii) Company shall provide Advertiser with a monthly invoice for Fees based on Advertiser's tracking and reporting; (iii) Advertiser has ten (10) calendar days from the end of the prior month's reporting period to provide written notice of any good-faith dispute of any Fees, after which all undisputed Fees shall be indisputable; and (iv) Advertiser shall pay all undisputed Fees to Company no later than twenty (20) calendar days from the date of the invoice.

   **B.  Credit Card Authorization.**    Except with respect to prepaid Services, Company may require Advertiser to provide a credit card and associated billing information to Company to maintain on file in the event of non-payment of undisputed Fees. In the event that Advertiser fails to timely pay an invoice, Advertiser authorizes Company to charge such credit card for any amount up to the total amount of all unpaid and undisputed Fees associated with such invoice. Any such credit card payments will be assessed a three and a half percent (3.5%) processing fee, charged at the time of processing.

   **C.  Taxes.**  Advertiser will be responsible for, and will promptly pay or reimburse Company for, the payment of any sales, use, excise, value-added, or similar taxes, assessments, or duties (or other similar charges) imposed by any governmental agency that are based on or with respect to any Services or goods provided by Company to Advertiser, or the amounts payable to Company therefore.

   **D.  Unpaid Fees.**    Undisputed Fees not paid on or prior to their applicable due date, will bear interest at a rate of one and a half percent (1.5%) per month (or the highest lawful rate, if less).  Advertiser shall be responsible for all reasonable expenses (including attorneys' fees and collection costs) related to collecting undisputed Fees owed. Company may offset any fees it or any of its affiliated entities owe to Advertiser or any of its affiliated entities by any undisputed Fees that are owed.

   **E.  Audit.**  The party responsible for tracking and billing (the "responsible party") shall maintain accurate books and records regarding the determination of revenue and Fees due hereunder. The other party shall have the right to audit such books and records at its own expense upon reasonable prior notice no more than once every six (6) months. If an audit reveals an underpayment owed to Company, Advertiser shall pay such amount within fifteen

**HIK 000014**

Docusign Envelope ID: FE6C4EC4-41A3-41AD-9942-180E5B49C879

(15) days.  If Advertiser is the tracking party and the underreporting exceeds 10% of the correct amount, Advertiser shall pay Company's reasonable out-of-pocket audit costs.

**3.   Data Privacy.**

**A.   Ownership.**    Deliverables may include information that relates to an identifiable person or device such as IP address, device ID, telephone number, name, etc. (collectively, "User Data").  Advertiser has no ownership interest in, and is prohibited from using, transferring, or storing any User Data from rejected or returned Deliverables, or any other Deliverables that are not accepted and paid for by Advertiser (collectively, "Unaccepted Deliverables").  Unless otherwise specified in an IO, Company and Advertiser shall have joint ownership of User Data from Deliverables that are not Unaccepted Deliverables.

**B.   Privacy Obligations.**    Each party shall: (i) Maintain reasonable security measures, procedures, and practices appropriate to the nature of the information collected, used, or sold under the Agreement and to protect such information from unauthorized access, destruction, use, modification, or disclosure. Such security measures shall meet or exceed industry standards; (ii) Provide prompt written notice of any unauthorized disclosure, or likely unauthorized disclosure, of User Data, to the extent necessary for compliance by each party under applicable laws; and (iii) Promptly provide all assistance as is reasonably requested by the other party to meets its obligations under applicable privacy laws — including, but not limited to, the California Consumer Privacy Act, Cal. Civ. Code § § 1798.100 et seq. ("CCPA"), the California Privacy Rights Act ("CPRA"), the Colorado Privacy Act ("CPA"), the Connecticut Data Privacy Act ("CDPA"), the Virginia Consumer Data Protection Act ("VCDPA") and the Utah Consumer Privacy Act ("UCPA") —   with respect to responding to valid access, deletion, correction, opt-out preference, and similar requests; and (iv) with respect to websites that collect User Data or other personal information that may be exchanged hereunder, contain a link to the party's privacy policy, which shall comply with all applicable laws and permit the exchange of such information.

**4.   Terms for Specific Deliverables.**

The terms in the Section (Terms for Specific Deliverables) shall only apply to the extent that a corresponding Deliverable is specified in an IO.

**A.   Clicks.**  Company shall generate engagement by individuals with URLs or tracking devices as specified in an IO ("Clicks").  Clicks may only be generated through intended action by genuine consumers, and the use of fake redirects, automated software, or other fraudulent mechanisms is prohibited. Advertiser is responsible for providing prior written notice to Company of the URLs or other specifications as to where clicks are to be directed ("Landers"). Advertiser is responsible for maintaining such Landers and shall provide written notice to Company at least three (3) business day prior to changing any Landers. Absent such notice, Advertiser shall be responsible for any Fees for Clicks to such Landers provided that such Clicks otherwise comply with this Agreement.

**B.   Leads and/or Call Transfers.**    Company shall provide (i) User Data, as specified in an IO, to permit Advertiser to contact the individuals associated with such User Data ("Leads"), and/or (ii) transfers of telephone calls with individuals meeting the criteria as set forth in an applicable IO ("Call Transfers").  Company shall only provide Leads and Call Transfers for individuals who have consented to receive such contact. Advertiser is responsible for providing prior written notice to Company of the names of any clients, designees, or other third parties that may call any Lead or receive any Call Transfer generated hereunder ("Advertiser Designees"). Advertiser may only transfer or provide Leads or Call Transfers to Advertiser Designees in compliance with applicable laws and within the scope of consent of the individuals associated with such Leads or Call Transfers, and Advertiser must restrict further transfer by Advertiser Designees of User Data associated with such Leads or Call Transfers. Company may record any calls with Advertiser or Advertiser Designees, or transfers of such calls, including, without limitation, Call Transfers. Company shall be responsible for obtaining consent of consumers to record its calls with such consumers and Advertiser shall be responsible for obtaining consent of its agents or other transferees of such calls to record such calls. With respect to (i) any Leads that include permission to call and (ii) any Call Transfer that originates from an outbound call, Company agrees to provide to Advertiser, upon request from Advertiser, evidence of prior express written consent to call such consumer as required under applicable laws (including, without limitation, the Telephone Consumer Protection Act ("TCPA")), which evidence will include, at a minimum: screenshots of the notification and consent language appearing on sources from which the applicable

2

HIK 000015

Docusign Envelope ID: FE6C4EC4-41A3-41AD-9942-180E5B49C879

User Data was collected; the IP address of the source of the applicable User Data; and the date and time stamp indicating the time the applicable User Data was collected. Evidence of prior express written consent will include an agreement, in writing, bearing the signature of the consumer in writing (which may be electronic as permitted by applicable law) that authorizes a list of partners, expressly including Advertiser, to deliver or cause to be delivered to the individual advertisements or telemarketing messages using an automatic telephone dialing syste and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered.

**5.   Intellectual Property.**

Each party hereby acknowledges that, as between the parties, the other party and its licensors own all rights, title and interest in and to their respective websites, advertising creatives, and other Intellectual Property Rights (defined below) used in their respective businesses, including, without limitation, any data resulting from their interactions with customers, with the exception of jointly owned User Data. Each party's name(s) and logo(s) are trademarks of such party, and no right or license is granted to the other party to use such trademarks, except as expressly set forth herein. "Intellectual Property Rights", as used herein, includes all intellectual property rights worldwide, including (i) trade names, registered and unregistered trademarks, service marks, logos and any applications therefor; (ii) all patents, patent applications and invention disclosures, including the inventions and improvements described and claimed therein; (iii) all registered and unregistered copyrights in both published works and unpublished works; (iv) all rights in mask works; (v) all rights in such party's know-how, trade secrets, ideas, confidential or proprietary information, software, both object and source code, technical information, data, process technology, plans, drawings, inventions and discoveries, whether or not patentable, and (vi) all rights in internet web sites, internet domain names, keywords, keyword values and attributes, key word clusters and clustering techniques, advertisement creative and account organization on search engines.

**6.   Confidentiality.**

The terms of this Agreement and any non-public, proprietary, or sensitive information (written, verbal or otherwise) provided by the parties hereunder shall be deemed to be "Confidential Information." Without limiting the generality of the foregoing, Confidential Information shall include: any business, technical or financial information, software, trade secrets, methodologies, techniques, affiliate contact lists, vendor contact lists, pricing, sales information, forecasts, and any proprietary or confidential information of any third party. For the avoidance of doubt, any and all Unaccepted Deliverables, and associated User Data, shall be deemed Confidential Information of Company. Neither party shall at any time disclose any terms of this Agreement, nor any Confidential Information shared pursuant hereto, to any third party except to the professional advisors of either party or as may be required by applicable law, in which case advance written notice is to be given to the other party to afford it an opportunity to intervene and seek an order or other appropriate relief for the protection of its Confidential Information. The foregoing confidentiality provisions shall not apply where the receiving party can demonstrate that the information: (i) was previously known to the receiving party at the time of disclosure, free of any obligation to keep it confidential; (ii) became publicly known through no wrongful act of the receiving party; (iii) was rightfully received from a third party lawfully in possession of such information and who was not bound under any confidentiality provisions; or (iv) is independently developed without reliance upon or reference to the other receiving party's Confidential Information. Notwithstanding the foregoing, the parties acknowledge and agree that Company may list Advertiser's name and identify Advertiser as a client on Company's website, in other marketing material and verbally in connection with discussions between Company and prospective clients. The parties agree that monetary damages for breach of this Confidentiality Section may not be adequate and that the non-breaching party shall be further entitled to injunctive relief without the requirement to post a bond.

**7.   Representations and Warranties.**

   **A.   General.**       Each party represents and warrants to the other party that: (i) it has the full power and authority to enter into this Agreement, to grant the licenses granted hereunder and to perform the acts required of it hereunder; (ii) this Agreement constitutes the legal, valid and binding obligation of such party, enforceable against it in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and except as may be limited by federal principles of equity; and (iii) it shall comply with these Terms and all applicable laws including, but not limited to, the Federal Trade Commission Act, Fair Credit Reporting Act, TCPA, Do Not Call

HIK 000016

Docusign Envelope ID: FE6C4EC4-41A3-41AD-9942-180E5B49C879

Implementation Act, Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003 ("CAN-SPAM"), Amended Telemarketing Sales Rule ("TSR"), California Business & Professions Code § 17529.5, Restore Online Shoppers Confidence Act,  California Business & Professions Code § 17600-06, and state unfair, deceptive, or abusive acts or practices ("UDAAP") laws.

**B.  Creatives.**       To the extent that Advertiser provides or approves Creatives for use hereunder, or Company uses unapproved Creatives, such party represents and warrants that such Creatives shall: (i) only be intended for and, to the extent possible, disseminated to adults, (ii) not infringe upon any third-party rights, including Intellectual Property Rights (as defined below), and (iii) be truthful, non-deceptive, and comply with all applicable laws.

**C.  Actions.**       Company further represents and warrants that (i) Actions shall not be generated using any illegal or fraudulent means, and (ii) receipt of, or eligibility for, any incentive or compensation shall not be conditioned on completion of any Action.

**D.  Usage.**   Advertiser further represents and warrants that (i) neither Advertiser nor Advertiser Designees shall engage in any harassing, abusive, or illegal usage of Deliverables or User Data; (ii) Advertiser and Advertiser Designees may only use Deliverables and User Data for offering or marketing the relevant products or services as specified in an IO, and (iii) Advertiser and Advertiser Designees hold all applicable licenses necessary for offering or marketing the relevant products or services as specified in an IO.

**8.   Indemnification.**

**A.  Obligations.**       Each party (the "indemnifying party") hereby agrees to defend, indemnify and hold harmless the other party, and its respective officers, directors, shareholders, affiliates, and employees (each, an "indemnified party") from and against any losses, damages, liabilities, costs and expenses (including, without limitation, reasonable attorneys' fees, court costs and expert witness fees, if applicable) (collectively, "Losses") arising directly out of a claim or action brought against an indemnified party by a third party (collectively, the "claims") resulting from a breach of these Terms by the indemnifying party, including, without limitation, the breach of any applicable law by the indemnifying party.  Notwithstanding the foregoing, if there is a claim that a Lead or outbound Call Transfer sold by Company for a telemarketing campaign to Advertiser did not have TCPA Consent, if Company can prove with competent evidence that it obtained TCPA Consent for the Lead or outbound Call Transfer that gave rise to the claim, then Company will support Advertiser in defending the claim, and will provide it with documentary proof of valid TCPA Consent, but will not defend, indemnify or hold Advertiser harmless unless there is a final determination by a court of competent jurisdiction (or in the context of settlement negotiations, an admission by Company) that Company did not obtain valid TCPA Consent.  In that event, Company shall fully indemnify, defend and hold Advertiser from all Losses associated with such Lead or outbound Call Transfer. Notwithstanding anything to the contrary in this Agreement, Company provides no warranty or representation, and shall have no liability or indemnification obligation, with respect to calls or texts that are made using a prerecorded or artificial voice.

**B.  Notice.**  If any claim is or will be brought against the indemnified party in respect to any allegation for which indemnity may be sought from the indemnifying party, the indemnified party will promptly notify the indemnifying party of any such claim of which it becomes aware (and in no case later than fifteen (15) business days upon becoming aware of such claim) and will provide reasonable cooperation to the indemnifying party at the indemnifying party's expense in connection with the defense or settlement of any such claim.

**C.  Procedures.**       Promptly upon notice of an indemnification claim (and in no case later than five (5) business days prior to any court-related deadline) the indemnified party shall elect in writing either that:

(i) The indemnifying party shall have sole and exclusive control over the defense and settlement of any such third party claim; provided, however, the indemnifying party will not agree to any judgment or enter into any settlement that adversely affects the indemnified party's rights or interests without the indemnified party's written consent, which will not be unreasonably withheld or delayed.  If the indemnified party elects for the indemnifying party to have sole and exclusive control of the defense pursuant to this subsection, the indemnified party shall be entitled to participate at its own expense in the defense of any such claim; or

HIK 000017

Docusign Envelope ID: FE6C4EC4-41A3-41AD-9942-180E5B49C879

(ii) The indemnified party shall have sole and exclusive control over the defense and settlement of any such third party claim, however, the indemnified party will not agree to any judgment or enter into any settlement that adversely affects the indemnifying party's rights or interests without the indemnifying party's written consent, which will not be unreasonably withheld or delayed.  If the indemnified party elects to have sole and exclusive control of the defense pursuant to this subsection, the indemnifying party shall have no obligation to pay any of the indemnified party's attorney's fees for such defense.

**9.  No Warranty.**

EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT, NEITHER PARTY MAKES ANY WARRANTY WHATSOEVER, EXPRESS OR IMPLIED, AS TO THE DELIVERABLES, RELATED INFORMATION, PRODUCTS, SERVICES, AND/OR INFORMATION PROVIDED HEREUNDER. ADVERTISER UNDERSTANDS AND AGREES THAT THE DELIVERABLES AND RELATED INFORMATION IS PROVIDED ON AN AS-IS BASIS. COMPANY MAKES NO WARRANTY AS TO WHETHER ADVERTISER WILL REALIZE ANY PROFIT OR RECEIVE ANY PAYMENT FROM THE DELIVERABLES PROVIDED. UNLESS SET FORTH OTHERWISE HEREIN, BOTH PARTIES DISCLAIM ANY WARRANTIES THAT COULD BE IMPLIED IN CONTRACT, IN LAW, OR IN EQUITY, INCLUDING WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, QUALITY, ACCURACY, COMPLETENESS, RELIABILITY, OR PERFORMANCE, OR ARISING FROM USAGE OF TRADE, COURSE OF DEALING, OR COURSE OF PERFORMANCE.

**10.  Limitation of Liability.**

WITH THE EXCEPTION OF GROSS NEGLIGENCE AND/OR WILLFUL MISCONDUCT, IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER UNDER THE AGREEMENT FOR ANY CONSEQUENTIAL, SPECIAL, LOST PROFITS, INDIRECT OR OTHER DAMAGES WHETHER BASED IN CONTRACT, TORT OR OTHERWISE, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND NOTWITHSTANDING ANY FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY. EACH PARTY'S AGGREGATE LIABILITY UNDER THE AGREEMENT FOR ANY CLAIM IS LIMITED TO THE GREATER OF: (i) THE LIMITS OF ANY APPLICABLE INSURANCE POLICY, (ii) AN AMOUNT EQUAL TO THE TOTAL AMOUNT PAID BY ADVERTISER TO COMPANY HEREUNDER; OR (iii) ONE MILLION DOLLARS. EACH PARTY ACKNOWLEDGES THAT THE OTHER PARTY HAS ENTERED INTO THE AGREEMENT IN RELIANCE UPON THE LIMITATIONS OF LIABILITY SET FORTH HEREIN AND THAT THE SAME IS AN ESSENTIAL BASIS OF THE BARGAIN BETWEEN THE PARTIES.

**11.  Termination.**

The initial term of this Agreement will be one year from the Effective Date ("Initial Term").  Thereafter, this Agreement will renew automatically each year for as long as Company is continuing to provide Services on any campaign(s) governed by the IO(s), notwithstanding any end date that may be specified in the IO(s) ("Term"). Either party may terminate this Agreement and/or pause or terminate a campaign governed by an IO, upon two (2) business days' prior written notice to the other party. The parties understand and agree that if a campaign governed by an IO is paused, the Term will not expire if the subject campaign is reactivated within the ensuing three (3) month period. In the event of a material breach by either party, the non-breaching party may terminate the Agreement immediately upon written notice to the other party (email sufficient).  Any termination of the Agreement shall not relieve Advertiser of its payment obligations for undisputed Fees arising from Deliverables generated prior to such termination.

**12.  Miscellaneous.**

   **A.  Force Majeure.**  Other than for payment obligations, neither party will be liable, or be considered to be in breach of this Agreement, on account of such party's delay or failure to perform as required under the terms of this Agreement as a result of any causes or conditions that are beyond such party's reasonable control and that such party is unable to overcome through the exercise of commercially reasonable diligence (a "Force Majeure Event").  If any such

HIK 000018

Docusign Envelope ID: FE6C4EC4-41A3-41AD-9942-180E5B49C879

Force Majeure Event occurs, including, without limitation, acts of God, fires, explosions, telecommunications, Internet or network failure, results of vandalism or computer hacking, storm or other natural occurrences, national emergencies, acts of terrorism, insurrections, riots, wars, strikes or other labor difficulties, or any act or omission of any other person or entity, the affected party will give the other party prompt notice of such Force Majeure Event and any resulting delay or inability to perform, and will use commercially reasonable efforts to minimize the impact of any such event.

**B.   Relationship of the Parties.**   The relationship of parties established by this Agreement is solely that of independent contractors, and neither party is an employee, agent, partner or joint venturer of the other.   Neither party shall make any representations, warranties or covenants, or assume or create any obligations, on the other party's behalf.   Each party shall be solely responsible for the actions of its respective employees, agents and representatives.

**C.   Jurisdiction and Venue.**    The Agreement will be interpreted, construed and enforced in all respects in accordance with the laws of the State of Delaware, without giving effect to its conflicts of law principles.   Each party irrevocably consents to the exclusive jurisdiction of the state and federal courts of the defending party in connection with any action arising under or in connection with this Agreement. The parties agree that service pursuant to the notice provisions hereunder constitute valid and effective service of process in any action arising under this Agreement.

**D.   Notices.** Unless otherwise expressly provided herein, all notices shall be given in writing and delivered via email or registered mail or overnight express carrier (e.g. FedEx or UPS) to the email address or physical address provided by each party on the applicable IO and, in the case of Company, must also include a cc email sent to compliance@healthchoicenow.com.

**E.   Remedies; Waiver.**  Except as otherwise specified herein, the rights and remedies granted to a party under this Agreement are cumulative and in addition to, not in lieu of, any other rights and remedies which the party may possess at law or in equity.   Failure of a party to require strict performance by the other party of any provision shall not affect the first party's right to require strict performance thereafter. No delay or failure by either party to exercise any right, power or option under this Agreement, and no partial or single exercise of that right, power or option, shall constitute a waiver of that or any other right, power or option, unless otherwise expressly provided herein.  No waiver by either party of any breach of any provision hereof shall be deemed a waiver of any subsequent or prior breach of the same or any other provision.   No waiver of any right shall be effective against a party unless in writing and executed by the waiving party. A waiver of default shall not be a waiver of any other or subsequent default.

**F.   Entire Agreement.** This Agreement, together with any applicable IOs, contains the entire agreement between the parties with respect to the subject matter hereof and supersedes any and all prior written, electronic or oral agreements and understandings between the Parties. No modification change or amendment of this Agreement or any IO shall be valid, effective or legally enforceable against a party unless in writing and executed by a duly authorized representative of both parties.

**G.   Severability.**  If any provision contained in the Agreement is determined by a court of competent jurisdiction to be invalid, illegal or unenforceable in any respect under any applicable law, then such provision will be severed and replaced with a new provision that most closely reflects the real original intention of the parties, and the remaining provisions of the Agreement will remain valid, legally binding and in full force and effect. Any prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. For the avoidance of doubt, this Agreement shall supersede any click-wrap, click-through, or other online agreement that either party may present or navigate through in conjunction with the Services.

**H.   Assignment.**   Neither party shall, without the prior written consent of the other party, assign its rights or delegate its duties under the Agreement, which consent shall not be unreasonably withheld, delayed or conditioned; *provided, however*, that either party may, in the event of a merger, acquisition, joint venture, or sale of substantially all of such party's assets or business (or any substantially similar transaction), assign the Agreement without the consent of the other party.   Subject to the foregoing, the provisions of the Agreement shall be binding upon and inure to the benefit of the parties and their permitted successors, heirs and assigns.

**I.   Survival.**   All provisions of this Agreement that by their nature and/or content are intended to survive completion, termination or expiration hereof shall so survive. Without limiting the generality of the foregoing, the terms of the Agreement set forth in Sections 2, 3, 5-10, and 12 shall so survive.

6

**HIK 000019**

Docusign Envelope ID: FE6C4EC4-41A3-41AD-9942-180E5B49C879

**J.   Costs and Expenses.**   Except as may be expressly provided herein, each party agrees that it is solely responsible for all costs and expenses incurred by it in connection with the performance of its obligations and the bringing of any claims or disputes hereunder.

**K.  No Third Party Rights.**  Except as may be expressly provided herein, nothing in this Agreement shall be enforceable by any party other than the parties hereto, and no third party beneficiary rights are conferred on any third party.

**L.   Section Headings**. The titles to the paragraphs in this Agreement are solely for the convenience of the parties and shall not be used to explain, modify, simplify, or aid in the interpretation of said covenants or provisions set forth therein.

**M.  Counterparts**. This Agreement and any IO(s) may be executed in any number of counterparts, each of which shall be deemed to be an original as against the party(s) whose signature(s) appears thereon, and all of which shall together constitute one and the same instrument. A faxed signature shall have the same legally binding effect as an original signature. An email signature shall not be legally sufficient to bind either party to this Agreement.

**N.  No Reliance; Interpretation**. Each party acknowledges and agrees that it (i) has had the opportunity to seek the advice of legal counsel of its choice, (ii) has read and understood all of the terms and conditions of this Agreement, and (iii) acknowledges that the provisions of this Agreement were negotiated to reflect an informed, voluntary allocation between them of all the risks (both known and unknown) associated with the transactions contemplated hereunder. Neither party has relied upon any statement, representation or promise of the other party in executing this Agreement, except as may be expressly stated herein. Each party acknowledges that it participated in the preparation of this Agreement.  The parties stipulate, therefore, that the rule of construction that ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement.

**IN WITNESS WHEREOF,** and intending to be legally bound hereby, Advertiser and Company have each caused these Terms to be executed by their duly authorized representatives.

**Advertiser:  Alvarado Marketing Group**    **Company: Health Choice Now, LLC**

Signature: _Jess Jordan_    Signature: _Eric Feinman_

Name: Jess Jordan    Name: Eric Feinman

Title:  dIRECTOR OF OPERATIONS    Title: President

Date: 11/13/2024    Date: 11/14/2024

7

**HIK 000020**