**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION**

| | | |
|---|---|---|
| MONTWAIN CARTER, individually and on behalf of all others similarly situated, | : : : | CIVIL ACTION FILE NO. 3:25-cv-00005-SHL-WPK |
| Plaintiff, | : : | |
| v. | : : | |
| HEALTH INSURANCE KING AGENCY, LLC, ALVARADO MARKETING GROUP, INC, AND HEALTH CHOICE NOW, LLC | : : : : | **JURY TRIAL DEMANDED** |
| Defendants. | : : | |
| _____ | / | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT HEALTH CHOICE NOW, LLC'S MOTION TO COMPEL
ARBITRATION**

**TABLE OF CONTENTS**

I.   INTRODUCTION.............................................................................................................. 1

II.  FACTUAL BACKGROUND ............................................................................................ 2

III. LEGAL STANDARD ....................................................................................................... 6

IV.  ARGUMENT.................................................................................................................... 7

A.   **No Agreement to Arbitrate Was Formed, Because the Arbitration Term Was Presented as an Unenforceable Browsewrap and Plaintiff Never Manifested Assent to It.** 7

   1.   Eighth Circuit law distinguishes enforceable clickwraps from browsewraps, which bind a user only on a showing of adequate notice. ................................................................. 7

   2.   What Defendant deployed is a browsewrap, not a clickwrap. ...................................... 8

   3.   Defendant cannot establish either actual or inquiry notice of the arbitration provision. 9

B.   **Independently, Plaintiff's Declaration and the Anomalies in Defendant's Own Records Place Formation "In Issue," Requiring Denial or, at Minimum, a Trial.** .......... 12

C.   **Health Choice Now's Remaining Arguments Do Not Save the Motion.** .................... 16

   1.   The delegation clause does not reach the question of formation. ............................... 16

   2.   The consent materials do not name Health Choice Now, the entity alleged to have placed the calls, nor Alvarado, nor HIK. ................................................................................ 17

   3.   The websites do not comply with the E-SIGN Act........................................................ 18

   4.   Plaintiff's TCPA claim falls outside the clause's scope and bears no connection to the purported visits............................................................................................................ 20

V.   CONCLUSION ............................................................................................................... 20

CERTIFICATE OF SERVICE ................................................................................................ 21

## I.    INTRODUCTION

Defendant Health Choice Now, LLC asks this Court to force Plaintiff into a private arbitration he never agreed to, based on a contract he never made, arising from website "visits" that likely never occurred. The motion fails at the threshold for two independent reasons, either of which requires denial.

*First*, no one, not Plaintiff, not anyone, ever manifested assent to arbitrate. Health Choice Now's own evidence establishes that the arbitration clause was never conspicuously presented *to anyone* for their agreement. As the declaration of Ben Zitter makes clear, the purported arbitration clause sat behind a hyperlink to "Terms and Conditions" on the Defendant's website, without any required manifestation of assent. And the only box Defendant claims that Plaintiff clicked (he did not) by its very terms *said nothing about arbitration*. All it did was to ask the purported user to "confirm" the accuracy of their information and "consent to be called." That is a browsewrap, not a clickwrap, and the distinction is dispositive under the very Eighth Circuit decision Health Choice Now invokes. A browsewrap binds a user only on a showing of adequate notice, and terms hidden behind a hyperlink at or below an action button do not supply it. Because Health Choice Now cannot show that Plaintiff (or anyone) was put on notice of, much less assented to, the arbitration provision, no agreement to arbitrate was ever formed.

*Second*, the data Health Choice Now relies on is not the digital footprint of a single human consumer. Rather, it bears indicia of automated lead generation. Health Choice Now invokes more than thirty alleged "interactions" with a dozen websites it claims to operate through its affiliate What If Holdings, LLC d/b/a C4R Media Corp. ("What If"), hawking everything from sweepstakes to "free" money, class action "information," and "assistance" with government benefits. To add insult to injury, Defendant's own records allege that Mr. Carter allegedly typed in all his personal information to both purported submissions it claims a third

party verified *in three seconds* from the same IP address months apart, followed by an unverified "visit" from a different IP address submitting Plaintiff's information hours later on April 29, 2023, and a parade of mutually inconsistent device fingerprints. That is not how a real person browses the web. It is how automated software fills out forms.

Plaintiff swears under oath that he never visited these websites, never entered his information, never saw or agreed to any arbitration provision, used only a single BLU phone running Android 12 throughout that time, and never had internet service from MetroNet, the provider for the IP address Health Choice Now attributes to him. Carter Dec. ¶ 4-20. A court in the Northern District of Ohio has already confronted this exact playbook *with respect to the same parent company here*, including addressing the same three-second TrustedForm certificate and refused to compel arbitration, deferring any ruling until a jury decides whether the plaintiff ever formed an agreement. *Davis v. Clear Health, LLC*, No. 1:24-CV-00187-PAB, 2024 WL 4041421 (N.D. Ohio Sept. 4, 2024). The record here is stronger for Plaintiff than the record was in *Davis*.

The motion should be denied. In the alternative, and only if the Court finds a genuine dispute of fact as to formation, the FAA requires that the question be tried under 9 U.S.C. § 4.

## II.    FACTUAL BACKGROUND

This is a Telephone Consumer Protection Act case, arising under 47 U.S.C. § 227(c). After Plaintiff registered his cellular number on the National Do Not Call Registry on October 23, 2024, he alleges he received three insurance telemarketing calls, on November 25, November 26, and December 2, 2024. On the call he answered, the caller identified himself as "Timothy Reese" of Health Insurance King, directed Plaintiff to Health Insurance King's website, and tried to sell him Health Insurance King's insurance products. The Complaint alleges, after discovery, that Health Choice Now is directly liable for the calls that it transferred to Health Insurance King. Plaintiff brings this action for himself and a class of similarly situated call recipients.

Health Choice Now, which describes itself as an "affiliate" of What If and C4R Media, moves to compel arbitration based on a putative agreement allegedly formed on What If's websites. Its motion rests entirely on Mr. Zitter's declaration and a handful of exhibits. The declaration describes the mechanics of the supposed agreement. When a user "enter[s]" a site, they provide their email address and click a "Submit" button. That website contains links to multiple policies, including, of relevance here, "Terms and Conditions" Zitter Dec. ¶ 11. There was no separate "I agree" button, no checkbox tied to the purported Terms, and no requirement that a user open, scroll through, or even see the arbitration clause before proceeding. Zitter Dec. ¶ 11-14. However, despite claiming and including a screenshot of a website called "Top Credit Card Finder," Defendant presents only two exhibits of two visits to two *different* websites, a January 25, 2023 visit to "claim.theclassactionguide.com" and an April 29, 2023 visit to "find.usaassistanceguide.com" both of which do not include the aforementioned "Terms and Conditions" link *at all*, let alone *any* language purporting to manifest an agreement to arbitrate:

Neither the aforementioned disclosure nor the checkbox says a word about arbitration, the Terms and Conditions, or resolving any dispute in any forum. The only affirmative act Health Choice Now can point to, in other words, is a consent checkbox that is silent on arbitration. Of the more than thirty "interactions" Health Choice Now invokes, its declaration

3

focuses on one as the "Agreement to Arbitrate," a May 29, 2025 visit to go.topcardfinder.com. Zitter Dec. ¶ 9-15. That visit *postdates* the calls at issue by *six months*, this *very litigation by five months*, and Health Choice Now offers no third-party certificate for it at all, as it did with respect to the "Class Action Guide" and "USA Assistance Guide" websites. The "neutral third party" proof on which the motion leans thus has nothing to do with the arbitration clause.

Health Choice Now represents to this Court that the more than thirty interactions "show consistency in terms of the mobile device, operating system, and browser" and originate from "a repetitive series of IP addresses." Br. 7. Exhibit A shows neither. It instead shows a pattern that is difficult to reconcile with a single human being and is readily explained by automated form submissions. The useragent strings in Exhibit A reflect a rotating cast of devices: a Motorola moto g(7) play running Android 9; a Google Pixel 2 XL running Android 8; two different Samsung Galaxy models (a SM-G781U and a SM-G975U), both running Android 12; a Motorola moto g pure running Android 11; and, in May 2022, a desktop computer running Windows. Every entry from April 2023 forward then reports an identical Android 10; K device. A real consumer does not cycle through five or six different phones and a Windows PC and then freeze on a single contentless useragent for two years.

The IP data is more telling still. A single address, 152.117.105.21, appears on visit after visit from November 5, 2022 through April 29, 2023, nearly six months, even though those visits are attributed to a "mobile" device, whose IP address would ordinarily change as the user moved between networks. Then, on April 29, 2023, Exhibit A suddenly records two submissions of Plaintiff's information roughly two and a half hours apart from two entirely different IP addresses: one at 1:53 p.m. from 152.117.105.21 (the basis for the "USA Assistance Guide" allegation), and another at 4:19 p.m. from 174.240.253.44. A single person on a single device

does not submit the same personal information from two unrelated networks within hours. Across the full report, the entries originate from more than a dozen different IP addresses on multiple networks in multiple states. According to publicly available registration data, those addresses include one registered to the University of Illinois (72.36.125.229) and another to a network in Colorado (72.240.108.36), networks with no connection to Plaintiff, an Iowa resident.

Taken together, submissions completed in three seconds, an unchanging IP improbably tethered to a mobile device for half a year, followed by same-day submissions from disparate IP addresses, a shuffle of incompatible device fingerprints and useragents are the fingerprints of automated lead-generation software, not of a consumer sitting at a keyboard. At a minimum, they are not the "consistent" records Defendant swears they are.[1] A database that contradicts the declaration summarizing it cannot "definitively establish" that Plaintiff personally did anything.

Against that record, Plaintiff offers his sworn Declaration. He attests that he never visited the claim.theclassactionguide.com, find.usaassistanceguide.com the declaration describes and illustrates, that he never entered his name, telephone number, address, or date of birth into any of them, that he never saw or agreed to any "Terms and Conditions" or arbitration provision, and had no notice of any such provision until this motion was filed, that he never consented to telemarketing calls from any of these entities, that he never authorized anyone to enter his information, check any box, or click any button on his behalf, and that he would never have agreed to arbitrate. Carter Dec. ¶ 4-14, 20. He further attests that the only mobile phone he used during the relevant period was a BLU running Android 12, that he does not recognize IP address

---

[1]Defendant's declaration cannot even keep its corporate parentage straight: the brief says C4R Media and Health Choice Now are commonly owned by "What If Holdings, LLC," Br. 2 n.1, while the declaration says they are under the common control of "What If Media Group, LLC," Zitter Dec. ¶ 4, but elsewhere in the Declaration Zitter states he is "the Chief Compliance Officer of What If Holdings, LLC d/b/a C4R Media Corp." Zitter Dec. ¶ 2.

152.117.105.21, and that he has never had internet service from MetroNet, the provider for that address. *Id.* ¶ 16-19. He receives Medicaid through Iowa Total Care, which he contacts directly, and has never filled out an online form to request or apply for benefits. *Id.* ¶ 10. To the extent his information was "given out," he explains, he surmises it was either obtained verbally by a telemarketer during one of the calls or scraped from publicly available sources. *Id.* ¶ 13.

### III.    LEGAL STANDARD

The Federal Arbitration Act requires that, before compelling arbitration, the Court be satisfied that the parties actually agreed to arbitrate. 9 U.S.C. § 4; *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299 (2010) (courts may order arbitration "only where the court is satisfied that neither the formation of the parties' arbitration agreement nor . . . its enforceability or applicability to the dispute is in issue"). Arbitration is "a matter of consent, not coercion," *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 664 (2010), and consent is the "first principle" that underscores arbitration law. *Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 184 (2019).

As Health Choice Now concedes, the Court's threshold task is to decide "(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute." *Pro Tech Indus., Inc. v. URS Corp.*, 377 F.3d 868, 871 (8th Cir. 2004). The party seeking arbitration, here, Health Choice Now, "bears the burden" of proving the existence of a "valid contract." *Ballou v. Asset Mktg. Servs., LLC*, 46 F.4th 844, 851 (8th Cir. 2022). Because the FAA does not supply the rules of contract formation, ordinary state law principles of offer, acceptance, and mutual assent govern whether a contract was ever made. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).

When the parties rely on materials outside the pleadings, the Court applies a summary judgment standard, viewing the facts and drawing all inferences in favor of the party opposing arbitration. Where "a party attacks the very existence of an agreement," as Plaintiff does here,

"the courts must first resolve that dispute." *Horton v. LeafFilter N. LLC*, No. 3:25-CV-2318-X-BN, 2025 WL 2638665, at *2 (N.D. Tex. Sept. 12, 2025). And where the making of the agreement is genuinely "in issue," Section 4 "requires the district court to proceed to trial," with a jury if demanded. *Duncan v. Int'l Markets Live, Inc.*, 20 F.4th 400, 403 n.4 (8th Cir. 2021).

Finally, the threshold question whether an agreement was ever formed is always for the Court, never an arbitrator, regardless of any delegation clause. *Coinbase, Inc. v. Suski*, 602 U.S. 143, 144 (2024) ("[W]here a challenge applies "equally" to the whole contract and to an arbitration or delegation provision, a court must address that challenge."). Confronting Mr. Zitter's materially identical declaration, the *Davis* court held that "where a plaintiff challenges the formation of an arbitration agreement, the court, rather than the arbitrator, must first address the issue of formation," notwithstanding any delegation provision. 2024 WL 4041421, at *4.

## IV.    ARGUMENT

### A. No Agreement to Arbitrate Was Formed, Because the Arbitration Term Was Presented as an Unenforceable Browsewrap and Plaintiff Never Manifested Assent to It.

Health Choice Now bears the burden of proving that an agreement to arbitrate exists. *Ballou*, 46 F.4th at 851. It cannot carry that burden because on its own evidence the arbitration clause was never presented for assent. It (allegedly) lived behind a hyperlink on the websites, and no checkbox or button was tied to it. From Defendant's own evidence, the only affirmative act a user took, checking a box to be "called," was silent on arbitration and the purported Terms and Conditions as a whole. That is the paradigm of an unenforceable browsewrap, and it defeats the motion as a matter of law even if Plaintiff had visited the sites (he did not).

   1. *Eighth Circuit law distinguishes enforceable clickwraps from browsewraps, which bind a user only on a showing of adequate notice.*

The governing framework comes from the very decision Health Choice Now cites. In

7

*Foster v. Walmart, Inc.*, 15 F.4th 860, 863 (8th Cir. 2021) (cleaned up), the Eighth Circuit

explained the difference between the two principal forms of internet agreement:

> The first, a so-called "clickwrap" arrangement, requires the user to explicitly assent by clicking "I agree" (or something similar) before using the website or purchasing a product. . . . In these types of agreements, mutual assent is rarely an issue because the user sees the list of the terms and conditions before accepting them. . . . A "browsewrap" arrangement, on the other hand, imputes assent through the user's performance of some specific act—here, "using or accessing" [the] website. . . . [N]o [other] affirmative action is required[,] meaning that users are never asked if they agree to the terms and conditions. The terms themselves are also usually provided through a hyperlink rather than directly to the user. . . . So the validity of a browsewrap agreement often depends on whether there is adequate notice to create actual or constructive knowledge of [the] website's terms and conditions.

Because a browsewrap user is never asked to agree, the Eighth Circuit explained, "the

key . . . is the adequacy of the notice." *Id.* Notice comes in one of two forms. "Actual notice"

exists where the user in fact reviewed the terms, "most commonly after clicking on a hyperlink

and reviewing them." *Id.* "Inquiry notice," the only other route, "depends on whether the website

puts a reasonably prudent user on inquiry notice of the terms," and that question turns on "the

website's overall design and content," including whether the terms are reasonably conspicuous.

Mutual assent, a meeting of the minds, remains the touchstone, and where the record leaves it

disputed, the issue cannot be resolved against the nonmovant on the papers. *Id.* at 864 (vacating

and remanding where the district court resolved inquiry notice on a "meager record" and without

considering the dispute as to which plaintiffs visited the website).

   2.   *What Defendant deployed is a browsewrap, not a clickwrap.*

   Measured against that standard, what Health Choice Now describes is unmistakably a

browsewrap. By Mr. Zitter's account, a user enters the website and is asked to enter an email

address. On that website are hyperlinked terms containing multiple links, including one to the

Terms and Conditions containing the purported arbitration clause. There is no "I agree" button.

Unlike the purported "consent" to receive calls illustrated below, there is also no checkbox or

8

any other manifestation of assent tethered to these Terms and Conditions. The one box Health

Choice Now has demonstrated *was* allegedly clicked on its website (and that not by Plaintiff as

opposed to some robot or someone else), is a box purportedly giving consent to receive calls, not

arbitrate (Exs. F, G to Mot., ECF Nos. 52-7, 52-8):



All these boxes show (if anything) is a purported confirmation that the information is

"accurate" and that "consent" (which isn't TCPA-sufficient consent) to be contacted. This is

therefore not a case in which "the user sees the list of the terms and conditions before accepting

them" that forms a clickwrap agreement. *Foster*, 15 F.4th at 863. The clickwrap authorities on

which the motion relies are inapposite for that reason. The Court can see for itself that the design

did not put a reasonably prudent user on notice of an agreement to arbitrate, nor did it offer a

consumer the option of accepting or rejecting them.

> 3. *Defendant cannot establish either actual or inquiry notice of the arbitration*
>    *provision.*

Because this is a browsewrap, Health Choice Now must prove notice, and it can prove

neither kind. There is no actual notice. As will be explained below, Plaintiff swears he never saw

the Terms, and a three-second "visit" in Defendant's own evidence forecloses any inference that

anyone at all actually reviewed a hyperlinked, separate page of legalese. Nor is there inquiry

notice. Courts have repeatedly refused to find inquiry notice where, as here, the link to the terms simply appears on a website without calling out the presence of an arbitration clause. The Ninth Circuit reached this result on a demonstrably stronger browsewrap in *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856-57 (9th Cir. 2022), where it held that "the comparatively larger font used in all of the surrounding text naturally directs the user's attention everywhere else" and as a result the disclosed terms were not "displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it."

Plaintiff acknowledges that the "Top Credit Card Finder" website, unlike the Class Action or USA Assistance Guide websites, calls out the presence of an arbitration clause in a parenthetical. But the only relevant website visits that predate the calls that Defendant provides proof of, the aforementioned Class Action and Assistance sites, do not have such language. Defendant does not make a showing for why it is entitled to compel arbitration on a purported agreement entered into in May of 2025 on the Credit Card site, after this litigation had commenced. *Berman* further held that a notice fails unless it explicitly ties the user's action to acceptance, language such as "By clicking the Continue [] button, you agree to the Terms & Conditions." *Id.* at 858. The "SEARCH FOR YOUR CASH" button here carried no such language, or at best, the language was ambiguous and confusing, particularly insofar as it did not include notice of an arbitration provision *at all*.

Decisions applying these principles to functionally identical lead generation forms confirm the point. In *Rojas v. GoSmith, Inc.*, the defendant, like Health Choice Now, labeled its form a "clickwrap," but the only "click" was an action button ("See Job Matches") whose text said nothing about agreement. The court refused to enforce the arbitration clause, reasoning that "'See Job Matches' does not indicate assent or connect clicking the button to a contract's terms,"

and that "[n]o text informed [the user] that, by clicking the button, he was agreeing to a contract." No. 2:17-CV-281-JVB-JEM, 2020 WL 831585, at *3 (N.D. Ind. Feb. 20, 2020). That reasoning applies with equal force here. A person visiting the Class Action site simply indicates that they wish to "SEARCH FOR YOUR CASH," not agree to a contract. *Id.* And in *Gaker v. Citizens Disability, LLC*, a questionable website case materially like this one, the court refused to enforce a manifestly identical disclosure:

> [T]he Court concludes that Citizens has not met its burden to establish that "a clear and conspicuous disclosure was provided and unambiguous consent was obtained." The terms indicating that users who submitted their information on the Super-Sweepstakes website consented to be contacted by the site's marketing partners were printed in small font at the very bottom of the page. The Court accorded significant weight to the fact that the terms appeared below the "CONFIRM YOUR ENTRY" button, such that a user could—and in all likelihood, would—click on the button without ever reaching the portion of the page disclosing the terms.

654 F. Supp. 3d 66, 75-76 (D. Mass. 2023) (cleaned up). If terms positioned below a sweepstakes "entry" button do not give notice even of a consent provision, then a hyperlink to a separate page of "Terms and Conditions" that on at least one website did not even point out the presence of an arbitration provision at all, cannot give notice of a clause buried inside it.

The Eleventh Circuit applied these same principles last month and affirmed the denial of arbitration on facts more favorable to the movant than these. In *Tejon v. Zeus Networks, LLC*, the arbitration clause sat in hyperlinked terms beneath large action buttons in small grey text accompanying a disclaimer that stated that, by submitting, the user agreed to the Terms of Service. *Tejon v. Zeus Networks, LLC*, 174 F.4th 1322, 1324 (11th Cir. 2026). The Eleventh Circuit held the hyperlink "was not conspicuous," reasoning that "when important terms are placed below a highly conspicuous action button, it is not reasonable to assume that users will continue scrolling past the action button," and that "[c]onsumers cannot be required to . . . aimlessly click on words on a page in an effort to ferret out hyperlinks." *Id.* at 1325, 1326-27.

11

Critically, the plaintiff in *Tejon* had actually visited the site and clicked the button, and the agreement was still unenforceable. *A fortiori*, where Plaintiff never visited at all, where the only box he is alleged to have checked never referenced the Terms, and where the link on that website did not even point out the presence of an arbitration provision at all, Health Choice Now cannot show the notice that inquiry notice requires.

Health Choice Now cannot bridge the gap with its TrustedForm certificates, because, by Mr. Zitter's own account and the associated screenshots, those purported certificates document only an alleged agreement to be contacted, not any assent to the Terms or the arbitration clause.[2] The "neutral third party" evidence thus verifies, at most, an interaction with a box that says nothing about arbitration, which is no evidence of notice of the arbitration provision at all.

On this record, the motion should be denied because no assent to arbitrate was ever manifested. At the very least, the adequacy of notice on a browsewrap record is a fact question that cannot be resolved in the movant's favor on cropped screenshots and a self-interested declaration. That is precisely what *Foster* counsels. The Eighth Circuit vacated a ruling that resolved inquiry notice on a "meager record" because material disputes remained over whether the parties agreed to arbitrate. 15 F.4th at 863-64. Either way, Health Choice Now loses, outright, or after the § 4 trial it has not earned.

### B. Independently, Plaintiff's Declaration and the Anomalies in Defendant's Own Records Place Formation "In Issue," Requiring Denial or, at Minimum, a Trial.

Even if the websites had presented an enforceable agreement to arbitrate (they did not), Health Choice Now would still have to prove that Plaintiff *himself* was the human who formed it.

---

[2]The certificates are, moreover, out-of-court records generated by a third party who has not made a declaration offered to prove that a live human assented. To the extent they are offered for that truth, they are entitled to little weight and supply no competent proof that anyone manifested assent to arbitrate, particularly as they are inadmissible hearsay without foundation.

It cannot. A plaintiff's "unequivocal denial" that he agreed, supported by specific facts, places formation "in issue" sufficient to create a factual dispute; only a "convenient memory lapse" does not. *Davis*, 2024 WL 4041421, at *7. Plaintiff's denial could not be more unequivocal, and it is buttressed by serious anomalies in Defendant's own data.

Plaintiff testifies, under penalty of perjury, that he never visited the websites for which Defendant has alleged "neutral third party" evidence of a visit, never entered his information, never saw or agreed to any "Terms and Conditions" or arbitration provision, never consented to be called, never authorized anyone to act for him, and would never have agreed to arbitrate. Carter Dec. ¶ 4, 6-9, 14, 20. He used a single BLU phone running Android 12 throughout the relevant period, he does not recognize IP address 152.117.105.21, and he has never had service from MetroNet, the provider for that IP address. *Id.* ¶ 16-19. He receives Medicaid through Iowa Total Care and has never used an online form to seek insurance. *Id.* ¶ 10. That is sworn specific evidence and creates a factual dispute on formation. *Davis*, 2024 WL 4041421, at *7.

The records do not establish that a single human, let alone Plaintiff, was behind the submissions. Health Choice Now may respond that the shift from Android 11 to Android 10 in a later submission might simply reflect a change of device. Perhaps. But that explanation would concede that more than one device was in play, which undercuts Mr. Carter's declaration that he only used a single phone, the aforementioned BLU phone running Android 12. More importantly, it does not explain the IP data, which is where the records truly break down. The address 152.117.105.21 appears on submission after submission claimed by the Defendant for nearly six months, even though those submissions are attributed to a panoply of mobile devices whose IPs would normally change as they moved between networks and as they themselves changed. And on April 29, 2023, Exhibit A records two submissions of Plaintiff's information

13

about two and a half hours apart from two unrelated IP addresses, 152.117.105.21 at 1:53 p.m. and 174.240.253.44 at 4:19 p.m., despite stretching back to January using the 152.117.105.21 address. A single person using a single device allegedly making submissions over the course of almost six months does not submit identical personal information and then suddenly submit that same information from two different networks within hours. These patterns, together with the three second "visits," the unconvincing different devices, and IP addresses registered to the University of Illinois and to networks in Colorado, are far more consistent with automated submissions than with anything Plaintiff did. At the very least, they prevent Health Choice Now from carrying its burden of proving that Plaintiff was the user.

What's more, three seconds is not enough time to form a contract. Both TrustedForm certificates report that both website "visits" lasted three seconds. (Exs. F, G to Mot., ECF Nos. 52-7, 52-8). The *Davis* court confronted the very same three second record, from the very same company, and credited the plaintiff's averment "that it would have been impossible for him to visit the website for three seconds, as Mr. Zitter's Event Log indicates." 2024 WL 4041421, at *7. So too here. No person could enter a name, address, date of birth, ZIP code, and telephone number, let alone read a disclosure, open a separate page of Terms, locate an arbitration clause, and knowingly assent to it, in three seconds. Carter Dec. ¶ 19.

And the only data linking the submissions to Plaintiff, name, address, date of birth, and email is biographical information freely available online. Carter Dec. ¶ 13. The *Davis* court rejected the identical inference, holding that the movant "cites no authority to show that because a telephone number is submitted with accompanying personal information . . . the individual whose information is submitted must have been the user who accessed the website." 2024 WL 4041421, at *7.

14

On this record, denial is the appropriate disposition. Courts confronting comparable, or weaker records have denied motions to compel outright. In *Hobbs v. Apollo Interactive, Inc.*, a TCPA defendant tried to compel arbitration on the theory that the plaintiff had visited its insurance quote website; the plaintiff rebutted that theory by showing it was impossible, and the court denied arbitration outright instead of granting an arbitration trial:

> Plaintiff presented evidence that he "did not visit www.bestautoinsurance.com" and that it would have been impossible for him to access the website in the manner Defendant says he did. . . . Plaintiff also presented evidence that he does not own a device that uses the Windows 7 operating system; he uses his cellular telephone for internet access. Finally, Plaintiff stated that he "cannot know for certain who accessed" Defendant's website and input his information, but "[w]hat [he] do[es] know for certain is that [he] did not visit www.bestautoinsurance.com." From this, a reasonable factfinder could determine that Plaintiff did not enter his personal information on Defendant's website or click "submit." So, a reasonable factfinder could conclude that Plaintiff did not assent to the website's terms, including the arbitration provision. Accordingly, there is a genuine fact dispute as to whether Plaintiff entered an arbitration agreement with Defendant, and the Court thus cannot conclude as a matter of law at this stage in the proceedings that the parties had a valid agreement to arbitrate. For this reason, Defendant's motion to dismiss in favor of arbitration (ECF No. 14) is denied.

No. 4:19-CV-57 (CDL), 2019 WL 6878863, at *2 (M.D. Ga. Dec. 17, 2019) (cleaned up). The parallel is striking, down to the device mismatch, there, a Windows operating system the plaintiff did not use; here, among other devices, a Windows desktop computer that does not belong to Plaintiff. *Accord Conrad v. Camping World Holdings Inc.*, No. 4:24-CV-171-CLM, 2025 WL 66689, at *2 (N.D. Ala. Jan. 9, 2025) (denying motion to compel outright).

At an absolute minimum, courts faced with such records hold a trial on formation rather than compel arbitration. *Davis* itself, on a weaker record, found a genuine dispute and deferred until a jury determines whether [the plaintiff] entered into an arbitration agreement. 2024 WL 4041421, at *8. The same course followed in *Gilliam v. Prince Health Grp. LLC*, No. 1:24-CV-00033, 2025 WL 1126545, at *3 (M.D. Tenn. Apr. 16, 2025) (ordering a trial where the defendant offered no evidence that the plaintiff was the person who entered the information), and

15

*Woodard v. SmartMatch Ins. Agency, LLC*, No. 23 CV 5246, 2024 WL 4252803, at *3 (N.D. Ill. Sept. 20, 2024) (same). And recent authority confirms both the rule and the forum. The Eleventh Circuit in *Tejon* refused to enforce an arbitration clause against a plaintiff who actually visited the site, 174 F.4th at 1324, so the case for non-enforcement is overwhelming against a plaintiff who did not. The court in *Horton* likewise reaffirmed that where a party attacks the very existence of an agreement to arbitrate, as opposed to its continued validity or enforcement, the courts must first resolve that dispute, and that § 4 "calls for a summary trial – not death by discovery." 2025 WL 2638665, at *2-*3 (citing *Duncan*, 20 F.4th at 403-04).

Because the anomalies here appear on the face of Defendant's own exhibits, this case is stronger for outright denial than any of them. In the alternative, and only to the extent the Court finds a genuine dispute of fact as to formation, Section 4 requires that the question be tried, with a jury if demanded. 9 U.S.C. § 4; *Duncan*, 20 F.4th at 403-04. Plaintiff demands that jury trial.

### C. Health Choice Now's Remaining Arguments Do Not Save the Motion.
#### 1. *The delegation clause does not reach the question of formation.*

Health Choice argues that, because its Terms incorporate the AAA and JAMS rules, the arbitrator must decide everything, including whether an agreement exists. That conflates validity with formation. A delegation clause can commit questions of validity or scope to an arbitrator *only if* a contract was formed *in the first place*. The antecedent question, whether any agreement was ever formed, is for the Court *alone*. *Coinbase*, 602 U.S. at 151. Incorporating arbitral rules cannot bootstrap into existence a contract the plaintiff denies ever making. The *Davis* court rejected an identical delegation argument for exactly this reason: "Only if a court first determines that an agreement *exists* or was formed may a delegation provision *thereafter* be enforced." 2024 WL 4041421, at *4 n.5. Courts must decide the formation question, regardless of what the contract says about delegation. *Id.* Plaintiff challenges formation both factually, in that he never

16

visited the sites, Section B, *supra*, and legally, because the browsewrap never gave notice of, or secured assent to, any arbitration provision, Section A, *supra*. Those challenges apply equally to the contract as a whole and to the delegation provision nested within it, so the Court must decide them. *Coinbase*, 602 U.S. at 151.

> 2. *The consent materials do not name Health Choice Now, the entity alleged to have placed the calls, nor Alvarado, nor HIK.*

Even if a contract had been formed (it did not), it would not bind Plaintiff to arbitrate with *any* of the Defendants in this lawsuit.  The Complaint alleges that Health Choice Now is directly liable for the calls, and that the calls at issue were transferred through Defendant Alvarado to Defendant HIK. The call was transferred to HIK's agent, Timothy Reese, with whom Plaintiff spoke. Health Choice Now has not shown that it is a party to, or entitled to enforce, any arbitration agreement. Yet none of these entities appear in the consent or arbitration materials Defendant Health Choice relies on.

Moreover, because the website did not obtain Plaintiff's consent for Defendants to make telemarketing calls as an initial matter, any purported arbitration language in the website's terms and conditions does not apply to TCPA disputes, nor could it, because TCPA consent rules require naming a *specific seller* on whose behalf consent is obtained. At best, the disclosure runs to "C4R Media Corp or its marketing partners" and names neither Health Choice Now nor Health Insurance King nor Alvarado Marketing Group nor Timothy Reese. That matters under the TCPA, since telemarketing consent only extends to *the specific seller* on whose behalf consent is obtained. 47 C.F.R. § 64.1200(f)(9); *Mantha v. QuoteWizard.com, LLC*, No. CV 19-12235-LTS, 2021 WL 6061919, at *8 (D. Mass. Dec. 13, 2021); *see Larson v. Harman Mgmt. Corp.*, No. 116CV00219DADSKO, 2016 WL 6298528, at *4 (E.D. Cal. Oct. 27, 2016) (holding that consent in a TCPA case must include disclosure that the consumer is consenting to receive

17

telemarketing calls *from a specific seller*). If there is no consent with respect to a specific seller who made the illegal telemarketing calls at issue here, there can be no dispute about consent with respect to a *specific seller* for an arbitrator to arbitrate. Thus, even if the Court were to ignore the complete lack of evidence of a visit by the Plaintiff to the website, there remains no basis to conclude that the TCPA Defendants themselves are signatories or non-signatory-beneficiaries of the arbitration agreement or any other agreement that would have resulted from the website visit. In *Davis*, clicking C4R's "marketing partners" link revealed a list that did not include the entity seeking to compel arbitration. 2024 WL 4041421, at *2 n.3. A consent that cannot name the responsible seller cannot authorize that seller's calls, and an arbitration clause tethered to that consent cannot reach a dispute about those calls.

   3. *The websites do not comply with the E-SIGN Act.*

   Neither the purported agreement to receive calls nor the purported agreement to arbitrate actually comply with the express requirements of the E-SIGN Act. 15 U.S.C. § 7001(c). The FCC's regulations implementing the TCPA require a *signed* writing. 47 C.F.R. § 64.1200(c)(2); 47 C.F.R. § 64.1200(a)(2). Of course, one may elect to obtain electronic consent, including to arbitrate, in lieu of a signed writing. But if one does, that TCPA consent, and any associated arbitration agreement, must comply with the requirements under the E-SIGN Act. 47 C.F.R. § 64.1200(f)(9) (defining prior express written consent and requirements for electronic signatures); *see FCC TCPA Order*, 27 F.C.C. Rcd. 1830, 1844 (2012) ("[C]onsent obtained in compliance with the E-SIGN Act will satisfy the requirements of our revised rule, including permission obtained via [a] website form."). Consent obtained in accordance with the E-SIGN Act's requirements may be sufficient TCPA consent; consent obtained in violation of those requirements is a legal nullity because it is unsigned. *Id.*

Here, the legal disclosures required by the E-SIGN Act were not included in the purported "Terms of Use" containing the purported arbitration agreement that Defendant has identified. The record is devoid of any evidence even showing an *attempt* to comport with the Act's requirements. Indeed, no part of the website or the "Terms and Conditions" attached to the Defendant's motion indicated the hardware or software requirements for access to and retention of electronic records, nor was any consumer given the opportunity to provide their consent to sign and receive documents electronically. *Compare* ECF 52-3 *with* 15 U.S.C. § 7001(c)(1)(C)(i), (ii). Moreover, the website Terms and Conditions did not give any consumer a "statement" informing them of the procedures for granting or withdrawing consent, or *any* of the other required consumer disclosures, including the very consent to electronic records themselves. *Compare* ECF 52-3 *with* 15 U.S.C. § 7001(c), (c)(1).

A defendant lost a motion for summary judgment on substantively similar issue in *Mantha*, 2021 WL 6061919, at *8, based on a substantially similar agreement to that proffered here. In *Mantha*, the Court held that the consent to make calls purportedly obtained via a website was legally deficient because it did not meet the requirements of the E-SIGN Act. *Id.* As a result, in *Mantha*, the court entered partial summary judgment *on behalf of a plaintiff* on the issue of consent. *Id.* As the Court held in *Mantha*, such a failure to obtain the required E-SIGN disclosures is fatal to compliance with the E-SIGN Act and therefore cannot constitute express written consent. *Id.* Relatedly, a failure to do so is also dispositive of the enforceability of the arbitration provision as no legally binding contract formed as an initial matter. Yet another court similarly denied relief to the defendant at summary judgment based on a nearly identical failure to comply with E-SIGN's requirements. *Bradley v. DentalPlans.com*, No. CV 20-1094-BAH, 2024 WL 2865075, at *7 (D. Md. June 6, 2024). Therefore, even if the Court were to ignore

19

Defendant's complete lack of evidence of Plaintiff's factual agreement to arbitrate, there is no basis to conclude that the purported agreement was legally sufficient. Because any alleged agreement to arbitrate does not comply with the provisions of the E-SIGN Act, the Court must also deny the Defendant's motion on independent legal grounds, even if the Court were to hold, *arguendo*, that the Plaintiff agreed to arbitrate something as a factual matter.

> 4.  *Plaintiff's TCPA claim falls outside the clause's scope and bears no connection to the purported visits.*

Any dispute is outside any arbitration clause's scope for the independent reason that a TCPA claim is not a benefit of a website's terms of use. A claim for unlawful telemarketing is "an independent cause of action created by Congress," not something that arises out of or relates to a consumer's use of a website. *Starling v. OnProcess Tech., Inc.*, No. 1:23-CV-10949-JEK, 2024 WL 1258501, at *6 (D. Mass. Mar. 25, 2024). Nor is the purported consent topically or temporally connected to these calls. The submissions occurred on sketchy websites, not insurance sites, while the calls solicited insurance. *Cf. Davis*, 2024 WL 4041421, at *3 (purported consent obtained on a "job search website" could not support insurance calls). And the timing does not work: the only allegedly verified submissions date to early 2023, the calls came in late 2024, and the visit Health Choice Now features as the "Agreement to Arbitrate" postdates the calls by six months and this litigation by five. A 2023 submission cannot license calls placed eighteen months later, nor can an "agreement" to arbitrate after this action was filed.

## V.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant Health Choice Now, LLC's motion to compel arbitration in its entirety. In the alternative, to the extent a dispute remains, Plaintiff demands a jury trial pursuant to 9 U.S.C. § 4.

RESPECTFULLY SUBMITTED AND DATED this June 2, 2026.

20

/s/ Anthony Paronich
Anthony Paronich
Email: anthony@paronichlaw.com
PARONICH LAW, P.C.
350 Lincoln Street, Suite 2400
Hingham, MA 02043
Telephone: (617) 485-0018
Facsimile: (508) 318-8100

/s/ Andrew Roman Perrong
Andrew Roman Perrong, Esq.
Perrong Law LLC
2657 Mount Carmel Avenue
Glenside, Pennsylvania 19038
Phone: 215-225-5529 (CALL-LAW)
Facsimile: 888-329-0305
a@perronglaw.com

*Attorneys for Plaintiff and the Proposed Class*

## CERTIFICATE OF SERVICE

We hereby certify that on June 2, 2026, a copy of the foregoing was filed electronically. Notice of this filing will be sent by email to all parties who have appeared by operation of the court's electronic filing system.

/s/ Anthony Paronich
Anthony Paronich

/s/ Andrew Roman Perrong
Andrew Roman Perrong