IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | |
|---|---|
| MONTWAIN CARTER, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>HEALTH INSURANCE KING AGENCY, LLC; ALVARADO MARKETING GROUP, INC.; and HEALTH CHOICE NOW, LLC,<br><br>Defendants. | No. 3:25-cv-00005-SHL-WPK<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION** |

In this case arising under the Telephone Consumer Protection Act of 1991 ("TCPA"), Defendants Health Insurance King Agency LLC ("HIK") and Alvarado Marketing Group, Inc. ("Alvarado"), move to dismiss for lack of personal jurisdiction based on their putative lack of an agency relationship with the entity that placed calls to Plaintiff Montwain Carter. (ECF 53.) For reasons explained below, the Court concludes that HIK is amenable to personal jurisdiction in Iowa based on principles of apparent authority. Alvarado, however, is not subject to personal jurisdiction in Iowa under apparent authority or any other agency theory. The Court therefore GRANTS IN PART and DENIES IN PART the Motion to Dismiss. (ECF 53.) Alvarado will be DISMISSED WITHOUT PREJUDICE. The case against HIK will proceed.

## I. BACKGROUND.

Carter brings claims under the TCPA against HIK, Alvarado, and Health Choice Now, LLC ("Health Choice Now") in his individual capacity and on behalf of a putative nationwide class of similarly situated individuals. (ECF 45, ¶¶ 79–80, 95.) Carter has a cellular telephone number with the area code "563," which is associated with the Southern District of Iowa. (Id., ¶¶ 6, 21.) This is a residential telephone line that is not associated with a business. (Id., ¶¶ 22–24.) Carter's phone number has been registered on the National Do-Not-Call Registry since October 2024. (Id., ¶ 28.) "Despite this, [Carter] received at least 3 calls from either Defendants Health Choice Now or Alvarado" in late November and early December 2024 that solicited him to sign up for health insurance. (Id., ¶ 29.)

All three calls came from "563" area codes, but Carter rejected the first two. (Id., ¶¶ 30–32.) He answered the third call, which was transferred to HIK. (Id., ¶ 32.) During the call, a person named Timothy Reese collected information about Carter's age, insurance, and ZIP code while trying to solicit him for health insurance. (Id., ¶¶ 32–33; *see also* ECF 65-1, ¶ 14.) Reese identified himself as being affiliated with HIK, and public records indicate Reese was in fact an employee and licensed insurance producer for HIK. (ECF 65-1, ¶ 14; ECF 45, ¶ 34.) The third call was auto-dialed because there was a brief pause and delay before Carter answered, and there was no human being on the other end of the line the moment Carter answered. (ECF 45, ¶ 38.) Carter asserts that the first two calls were auto-dialed, too, because no one left messages after Carter failed to answer. (Id., ¶¶ 39-40.) Carter never did business with or consented to receive calls from any Defendant. (Id., ¶¶ 41–42.)

Carter alleges that HIK has a contractual relationship with Alvarado to help generate leads for insurance business. (E.g., id., ¶¶ 55, 59.) In turn, Alvarado uses Health Choice Now to make calls to help generate those leads. (Id., ¶¶ 56, 70.) Discovery has revealed that HIK paid Alvarado approximately $20,000 to $70,000 per week for billable leads at a rate of approximately $50 per lead. (Id., ¶ 44.) HIK received approximately 400 to 1,400 call transfers per week from Alvarado. (Id.) Carter therefore alleges that "Defendants mass-dialed calls indiscriminately and incessantly, including to numbers on the Do Not Call registry." (Id., ¶ 45.) Carter alleges that HIK is responsible for the calls placed by Alvarado and Health Choice Now that were routed back to HIK to generate insurance business. (Id., ¶ 50.) Carter further alleges that HIK had "full knowledge" that Alvarado and Health Choice Now were placing calls in violation of the TCPA but failed to take corrective action. (Id., ¶¶ 51–54.) The leads provided by Alvarado to HIK originate solely from Health Choice Now. (Id., ¶ 57.)

HIK's relationship with Alvarado is governed by an Advertiser Agreement that called on Alvarado to "acquir[e], generat[e], and licens[e] certain consumer information" and "transfer[] inbound calls from consumers expressing an interest in insurance products." (Id., ¶ 59.) The Advertiser Agreement obligates Alvarado to use "lawful methods" and "compl[y] with applicable laws," including the TCPA. (Id., ¶ 60.) Alvarado is obligated to indemnify HIK "for violations of TCPA or misrepresentations in lead generation." (Id., ¶ 62.) HIK, too, is required under the Advertiser Agreement to "comply with all applicable laws." (Id., ¶ 61.) HIK provides an "Insertion Order" to Alvarado specifying "campaign details including pricing, vertical, filters,

state/geography, volume caps, exclusivity, and return policies." (Id., ¶ 63.) HIK also has the authority to set "return policies" and reject leads that do not meet HIK's criteria. (Id.) HIK has the right to terminate Alvarado on thirty days' notice, or immediately upon material breach. (Id., ¶ 64.) HIK has never terminated Alvarado. (Id., ¶ 65.)

Alvarado is a one-employee marketing company that "acquires, generates, and licenses certain consumer information, transfers inbound calls from consumers expressing an interest in insurance products, and redirects users from its publish[ed] network to advertiser sites." (ECF 53, p. 21, ¶¶ 3–4.) Rather than place calls itself to potential customers, Alvarado "contracts with independent companies to provide call transfers to other companies." (Id., p. 22, ¶ 5.) As part of providing this service, Alvarado has the upstream contract with HIK in which Alvarado is obligated to "deliver Leads, Calls, and Redirects" and two downstream contracts with Health Choice Now that obligate Health Choice Now—rather than Alvarado—to place calls to consumers. (Id., p. 22, ¶ 6–8.) Health Choice Now then "deliver[s]" those calls to Alvarado as "call transfers." (Id., p. 22, ¶ 8.) The contracts between Health Choice Now and Alvarado require Health Choice Now to "ensure that any consent for the call be obtained from the individuals interested in health insurance." (Id.) The contract between HIK and Alvarado identifies the two entities as independent contractors of one another, not agents. (Id., p. 23, ¶ 12.) Likewise, the contracts between Alvarado and Health Choice Now identify the parties as having an independent contractor relationship, not an agency relationship. (Id., p. 23, ¶ 13.)

Consistent with its arrangement with Health Choice Now, Alvarado did not itself place any calls to Carter. (Id., p. 22, ¶¶ 8, 10.) The company does, however, have records of "inbound calls" dated December 2 and 3, 2024, associated with Carter's "563" area code that it transferred to HIK from Health Choice Now. (Id., p. 22-23, ¶ 11.) Alvarado does not have any records of calls to Carter on November 25 or 26, 2024. (Id., p. 23, ¶ 11.)

## II. LEGAL ANALYSIS.

### *A. Legal Background and Standards.*

"Personal jurisdiction can be specific or general." *Fastpath, Inc. v. Arbela Techs. Corp.*, 760 F.3d 816, 820 (8th Cir. 2014). Carter does not argue that the Court has general jurisdiction over HIK or Alvarado, instead focusing on specific jurisdiction. "Specific personal jurisdiction can be exercised by a federal court in a diversity suit only if authorized by the forum state's long-arm statute and permitted by the Due Process Clause of the Fourteenth Amendment." *Id.* "Because

Iowa's long-arm statute expands Iowa's jurisdictional reach to the widest due process parameters allowed by the United States Constitution, our inquiry is limited to whether the exercise of personal jurisdiction comports with due process." *Id*. (internal punctuation omitted).

"Due process requires that the defendant purposefully establish minimum contacts in the forum state such that asserting personal jurisdiction and maintaining the lawsuit against the defendant does not offend traditional conceptions of fair play and substantial justice." *Hawkeye Gold, LLC v. China Nat'l Materials Indus. Imp. & Exp. Corp*., 89 F.4th 1023, 1032 (8th Cir. 2023) (internal punctuation omitted). In other words, "[t]he defendant . . . must take 'some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum State.'" *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct*., 592 U.S. 351, 359 (2021) (second alteration in original) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). The act cannot be "random, isolated, or fortuitous." *Id*. (quoting *Keeton v. Hustler Mag., Inc*., 465 U.S. 770, 774 (1984)). The defendant must have "deliberately 'reached out beyond' its home." *Id*. (quoting *Walden v. Fiore*, 571 U.S. 277, 285 (2014)); *see also Fastpath*, 760 F.3d at 820–21 (defendant's contacts with forum state must cause it to "reasonably anticipate being haled into court there"). The Court's inquiry is on contacts "the defendant *himself* creates," as opposed to contacts between the plaintiff and forum. *Fastpath*, 760 F.3d at 821 (quoting *Walden*, 571 U.S. at 284). Also, plaintiff's claims must "arise out of or relate to [those] contacts." *Kendall Hunt Publ'g Co. v. Learning Tree Publ'g Corp*., 74 F.4th 928, 930 (8th Cir. 2023) (alteration in original) (quoting *Ford Motor Co*., 592 U.S. at 359)).

Courts analyze five factors in assessing minimum contacts: "(1) the nature and quality of [defendant's] contacts with the forum state; (2) the quantity of such contacts; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) convenience of the parties." *Hawkeye Gold, LLC*, 89 F.4th at 1032 (alteration in original). The first three factors take precedence over the last two, which "carry less weight and are not dispositive." *Kaliannan v. Liang*, 2 F.4th 727, 733 (8th Cir. 2021) (internal citation omitted).

Following a defendant's timely motion under Federal Rule of Civil Procedure 12(b)(2), the plaintiff has the burden to establish the existence of personal jurisdiction. *See Hawkeye Gold, LLC*, 89 F.4th at 1030. "[T]his burden does not shift because the defendant challenges jurisdiction." *Id.* To survive a timely motion to dismiss, a plaintiff must "'make a prima facie showing that personal jurisdiction exists' by pleading 'sufficient facts to support a reasonable inference that the defendant can be subjected to jurisdiction within the state.'" *Id.* (internal citation omitted). Unlike a motion

to dismiss for failure to state a claim, the Court may consider a larger pool of relevant documents in determining if jurisdiction exists, such as affidavits and other exhibits. *See Pederson v. Frost*, 951 F.3d 977, 979 (8th Cir. 2020). When the Court does not hold an evidentiary hearing, it views the facts in the light most favorable to the plaintiff. *Id.*

*B. The Court DENIES the Motion to Dismiss for Lack of Personal Jurisdiction as to HIK.*

It is well established that a single phone call to the forum state is enough to establish personal jurisdiction when the plaintiff brings a cause of action under the TCPA arising directly out of that call. "[M]ultiple courts have found calls or text messages to a phone number affiliated with a particular state that violate the TCPA sufficient to satisfy the [purposeful direction] test for a court of that state to exercise personal jurisdiction over the defendant." *Keim v. ADF MidAtlantic, LLC*, 199 F. Supp. 3d 1362, 1370 (S.D. Fla. 2016) (collecting cases). It does not matter whether the recipient of the call was actually in the forum state at the time of the call. *See Lowe v. CVS Pharmacy, Inc.*, 233 F. Supp. 3d 636, 645 (N.D. Ill. 2017).

Against this backdrop, it is undisputed that Carter received a call to his "563" number, which is associated with the State of Iowa. Nonetheless, HIK argues that it is not responsible for the call because it was placed by Health Choice Now, an entity with whom HIK has no direct relationship (contractual or otherwise). Instead, HIK's relationship is with Alvarado, which, in turn, has a contractual relationship with Health Choice Now. Carter, by contrast, argues that HIK is subject to personal jurisdiction in Iowa based on agency principles because, in his view, Alvarado and Health Choice Now are agents of HIK. *See Bradley v. DentalPlans.com*, 617 F. Supp. 3d 326, 337–38 (D. Md. 2022) (recognizing that an entity may be subject to personal jurisdiction in the forum state based on an agent's actions). Because agency principles are relevant to personal jurisdiction and TCPA liability alike, HIK's motion has broader implications even though it is technically just about personal jurisdiction. *See, e.g.*, *Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 591–92 (7th Cir. 2021) (evaluating personal jurisdiction according to the same agency principles that apply when determining liability).

To establish personal jurisdiction, Carter does not need to prove as a matter of law that HIK has an agency relationship with Health Choice Now, but rather that a "reasonable inference" can be drawn to that effect from Carter's allegations and evidence in the record. *See Hawkeye Gold, LLC*, 89 F.4th at 1030. With this standard in mind, the mere fact that HIK, Alvarado, and Health Choice Now included "independent contractor" language in their respective contracts or otherwise

tried to structure their relationships in a way that absolves HIK and Alvarado of responsibility for Health Choice Now's conduct is not enough, standing alone, to mean personal jurisdiction does not exist. *See Hand v. Beach Entertainment KC, LLC*, 456 F. Supp. 3d 1099, 1130 (W.D. Mo. 2020) ("[W]hether a relationship is characterized as agency in an agreement between parties … is not controlling" (quoting Restatement (Third) of Agency § 1.02 (2006).) Instead, the analysis must revolve around whether there are sufficient facts in the record to allow a reasonable inference that an agency relationship exists despite HIK's and Alvarado's efforts to structure their relationships otherwise. *See Bilek*, 8 F.4th at 587–588. As to HIK, Carter argues that he has made the requisite showing under theories of actual authority, apparent authority, and ratification.

As to apparent authority, the Court agrees. "Apparent authority is authority the principal has knowingly permitted or held the agent out as possessing. Apparent authority focuses on the principal's communications to the third party. In other words, apparent authority must be determined by what the principal does, rather than by any acts of the agent." *McGowen, Hurst, Clark & Smith P.C. v. Commerce Bank*, 11 F.4th 702, 712 (8th Cir. 2021) (quoting *Frontier Leasing Corp. v. Links Eng'g, LLC*, 781 N.W.2d 772, 776 (Iowa 2010) (internal citations and punctuation omitted). When evaluating apparent authority, "the Court is to focus on the principal's conduct from a third party's perspective, and decide whether that conduct reasonably gives the appearance that an agent is authorized to act [on behalf of the putative principal]." *Banks v. Pro Custom Solar*, 416 F. Supp. 3d 171, 174 (E.D.N.Y. 2018).

Here, the contract between HIK and Alvarado obligated Alvarado to generate "Leads, Calls, and Redirects." (ECF 53, p. 25.) In turn, Alvarado entered a contract with Health Choice Now in which Health Choice Now agreed, among other things, to "generate and deliver … leads [and] call transfers…" in the form of what the Insertion Order to the contract described as "Warm Transfers." (Id., pp. 27–28.) As a practical matter, this means that Health Choice Now would place calls to consumers like Carter and, if the consumer answered, Health Choice Now would immediately transfer the call to Alvarado, which then instantaneously would transfer it to HIK. Under this arrangement, the first and only person Carter communicated with was Timothy Reese, who identified himself to Carter as being with HIK. It appears to be undisputed that Reese indeed worked for HIK as a licensed insurance producer.

From Carter's perspective, these facts would have—or, at least, reasonably *could* have—given him the impression that the call had come directly from HIK itself even though it turns out

in retrospect that something more was happening behind the scenes. Indeed, when answering the phone, one generally would assume that the person on the other end of the line initiated the call. Here, when Carter answered the call, the person on the other end of the line was Reese, who accurately identified himself as being affiliated with HIK and attempted to solicit Carter for health insurance on HIK's behalf. This is enough to create a reasonable inference of an apparent authority relationship between HIK and the downstream companies that actually placed or facilitated the call. *See Katz v. Allied First Bank, SB*, No. 22 C 5277, 2026 WL 636723, at *10 (N.D. Ill. Mar. 6, 2026) (holding that plaintiff established sufficient facts to show agency relationship based on apparent authority where third party marketer provided "warm transfer" to defendant); *Banks*, 416 F. Supp. 3d at 174–75 (holding that plaintiff stated viable TCPA claim against defendant where "at the conclusion of prerecorded messages, he was transferred to a live representative of [defendant]"); *Landy v. Nat. Power Sources, LLC*, No. 321CV00425PGSTJB, 2022 WL 797967, at *3 (D. N.J. Mar. 16, 2022) (holding that plaintiff stated viable TCPA claim under actual or apparent authority principles where there was a "smooth transfer" from the caller to one of defendant's representatives); *see also Bradley*, 617 F. Supp. 3d at 344 (holding that plaintiff reasonably believed defendant authorized correspondence based on how the third party marketing company communicated with him).

In arguing otherwise, HIK relies on a handful of district court cases dismissing for lack of personal jurisdiction in situations where defendants relied on third-party marketing companies to contact potential customers. These cases are, however, distinguishable. In *Callier v. Wide Merch. Inv., Inc.*, 671 F. Supp. 3d 736, 744–45 (W.D. Tex. 2023), the defendants submitted an unrebutted affidavit stating that they did not communicate directly with the plaintiff or otherwise exercise any control over how the third-party telemarketer obtained leads or what the third-party telemarketer said during phone calls. The same was true in *Day v. Renny*, 8:20-cv-104, 2020 WL 13002519, at *4 (D. Neb. July 24, 2020). Here, by contrast, the Declarations do not claim that no one from HIK ever spoke to the plaintiff; instead, it appears to be undisputed that the relationship between HIK, Alvarado, and Health Choice Now was structured to cause the immediate transfer of the call to HIK if and when a consumer answered. In these circumstances, a reasonable inference can be drawn that HIK knew and intended that the consumers on the receiving end of the phone calls would not speak to anyone before being connected to an HIK insurance producer. If so, for the reasons stated above, HIK left consumers like Carter in the position of believing, reasonably, that

HIK itself initiated the call. This is enough to put this case on different footing than *Day* and *Callier* and give rise to personal jurisdiction under an apparent authority theory. *See Katz*, 2026 WL 636723, at *10; *Banks*, 416 F. Supp. 3d at 174–75.

The other cases relied upon by HIK are also distinguishable. In *Cunningham v. Autoguard Advantage Corp.*, No. 3:23-CV-00238, 2024 WL 818381, at *7 (W.D. N.C. Feb. 27, 2024), there was no contract between the defendants and third-party marketer at all, nor was there any indication that any defendant was aware of the methods used by the marketer to generate leads. In *Moore v. Charter Commc'ns, Inc.*, 523 F. Supp. 3d 1046, 1052 (N.D. Ill. 2020), the defendant submitted unrefuted evidence that it expressly forbade the marketing company from making telephone calls. Finally, in *Kline v. Advanced Ins. Underwriters, LLP*, No. 1:19-CV-00437, 2020 WL 14028040, at *5 (M.D. Pa. June 23, 2020), *report and recommendation adopted sub nom. Kline v. Advanced Ins. Underwriters, LLC*, No. 1:19-CV-00437, 2020 WL 14028040, at *5 (M.D. Pa. July 10, 2020), the plaintiff did not even respond to the motion to dismiss, much less provide anything other than "bare and unsupported" allegations of any sort of relationship between the defendants and the entity that placed the calls. Here, by contrast, HIK contracted with Alvarado to obtain live calls and made its own representative available the moment Alvarado forwarded those calls from Health Choice Now. Thus, again, a reasonable inference can be drawn that HIK intended to give consumers like Carter the impression that the call he received came directly from HIK.

It bears repeating that when Carter received the call, the first and only person who spoke to him, Reese, tried to sell him health insurance after identifying himself as being affiliated with HIK. In other words, it was HIK's agent's own communications with Carter that contributed to Carter's reasonable belief that HIK made (or, at least, *authorized*) the call to the State of Iowa in the first instance. This is enough to allow Carter to satisfy his burden of establishing personal jurisdiction over HIK in Iowa under an apparent authority theory. *See Bradley*, 617 F. Supp. 3d at 344 (denying motion to dismiss for lack of personal jurisdiction where defendant's own manifestations contributed to plaintiff's belief that actual authority existed for the communications); *Banks*, 416 F. Supp. 3d at 174–75 (similar). Indeed, courts have concluded that personal jurisdiction exists when defendants merely provide a script for a telemarketer to use when speaking to potential customers. *See, e.g.*, *Salaiz v. Pelican Inv. Holdings Grp., LLC*, No. EP-22-cv-29-FM, 2022 WL 17813229, at *2 (W.D. Tex. Nov. 10, 2022); *Toney v. Quality Res., Inc.*, 75 F. Supp. 3d 727, 743 (N.D. Ill. 2014). Surely the exercise of personal jurisdiction is just as appropriate

when the defendant sets up the relationship in a way that dispenses with the script altogether and lets the defendant's own employee or licensed agent do the talking from the first moment.

For these reasons, the Court DENIES the Motion to Dismiss as to HIK.

*C. The Court GRANTS the Motion to Dismiss for Lack of Personal Jurisdiction as to Alvarado.*

Unlike HIK, no one from Alvarado spoke directly to Carter or any other consumer. Instead, Alvarado silently served as a middleman between HIK and Health Choice Now. This makes the personal jurisdiction analysis for Alvarado different than the analysis for HIK given that "[a]pparent authority focuses on the principal's communications to the third party." *See Commerce Bank*, 11 F.4th at 712. Alvarado made no overt communications to Carter here and thus cannot be subject to personal jurisdiction based on apparent authority. *See Spiegel v. Reynolds*, No. 15 C 8504, 2016 WL 6877625, at *4 (N.D. Ill. Nov. 22, 2026) ("The Amended Complaint does not allege that [defendants] ever interacted with [plaintiff], so apparent authority is off the table.").

Carter also has failed to meet his burden on actual authority and ratification theories. Even when reasonable inferences are drawn in his favor, Carter has merely established that Alvarado had a contract with Health Choice Now to generate leads in the form of "warm transfers" that Alvarado would transfer to HIK. (ECF 53, p. 27.) The record does not, however, suggest that Alvarado was involved in placing any calls, nor does the record show that Alvarado had any control over who Health Choice Now called or what the company would say. Carter therefore has failed to establish that Alvarado purposefully directed any activities at the State of Iowa. *See Braver v. Clear Sky Fin., LLC*, No. CIV-22-710-R, 2023 WL 5439224, at *2 (W.D. Okla. Aug. 23, 2023) (dismissing defendant for lack of personal jurisdiction because defendant merely hired vendor and did not have direct involvement in making calls or scripting what the vendor said).

The fact that Alvarado got paid by HIK for generating leads and had the ability to terminate the contract with Health Choice Now does not change this result. The determinative question for purposes of personal jurisdiction is not whether the defendant chose the telemarketer or benefited in some way from the phone calls, but rather whether the defendant had sufficient control over the telemarketer's conduct to allow a reasonable inference of an agency relationship. Here, the record does not suggest that Alvarado had any meaningful level of control over Health Choice Now's day-to-day conduct. *See Gaudian v. Progressive Debt Relief, LLC*, No. EP-23-CV-00235, 2023 WL 7393129, at *3 (W.D. Tex. Nov. 8, 2023) ("A TCPA plaintiff does have to allege more than

just that the defendants are vicariously liable because they are direct beneficiaries of the telemarketing calls"), *report and recommendation adopted*, No. EP-23-CV-00235, 2023 WL 8242475 (W.D. Tex. Nov. 28, 2023). Indeed, Alvarado did very little, period, other than serve as a silent middleman between HIK and Health Choice Now. This is not enough to mean that Alvarado purposefully availed itself of the privilege of conducting business in Iowa. *See id.*; *Callier v. SunPath Ltd.*, No. EP-20-CV-00106, 2020 WL 10285659, at *3 (W.D. Tex. Aug. 10, 2020).

Carter also has not alleged sufficient facts to allow a reasonable inference that Alvarado was aware of alleged violations of the TCPA by Health Choice Now. In his Amended Complaint, Carter baldly alleges that HIK knew of TCPA violations by Alvarado and Health Choice Now. (ECF 45, ¶¶ 51, 52.) He does not, however, substantiate this allegation (such as by alleging that a consumer informed HIK of the violations), nor does he allege that Alvarado knew of violations by Health Choice Now. In a situation where it appears to be undisputed that Health Choice Now was the entity dialing the numbers, Carter has not established a reasonable inference that Alvarado knew of alleged violations at all, much less that Alvarado is responsible for them under agency principles.

For these reasons, the Court GRANTS the Motion to Dismiss as to Alvarado.

## III. CONCLUSION.

HIK is subject to personal jurisdiction in Iowa under agency principles. Alvarado is not. The Court therefore GRANTS IN PART and DENIES IN PART the Motion to Dismiss. (ECF 53.) Defendant Alvarado Marketing Group, Inc., is DISMISSED WITHOUT PREJUDICE.

**IT IS SO ORDERED.**

Dated: August 24, 2026

STEPHEN H. LOCHER
U.S. DISTRICT JUDGE